THE UNIVERSITY COUNTRY CLUB, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3890-72.     Filed June 23, 1975.

*John W. Mooers, Hugh R. Dowling, Charles L. Dunlap,* and *Howard O. Morris, Jr.,* for the petitioner.

*Robert J. Shilliday, Jr.,* for the respondent.

GOFFE, *Judge:* The Commissioner determined deficiencies in petitioner's corporate Federal income tax for the taxable years as follows:

| Year | Amount |
| --- | --- |
| 1966 | $52,793.48 |
| 1968 | 2,307.33 |
| 1970 | 1,913.48 |

The issues presented for decision are: (1) Whether payments to petitioner from a separate class of shareholders, who were also members of its club, should be characterized as income or contributions to capital; (2) whether initiation fees paid by non-shareholder members were income or contributions to capital; (3) if the above payments are income, whether petitioner has, as a consequence, omitted more than 25 percent of gross income from its income tax return for 1966, extending the statutory

period for assessment as provided in section 6501(e)(1)(A); [1] (4) if there has been more than a 25-percent omission from gross income, whether petitioner has precluded the application of section 6501(e)(1)(A) by making a statement in its 1966 income tax return which was adequate to apprise respondent of the nature and the amount of the omitted item; and (5) whether petitioner's golf course, grass, and driving range are depreciable.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and exhibits are incorporated by this reference.

The University Country Club, Inc. (hereinafter referred to as petitioner or club), is a corporation organized for profit under the laws of Florida. Its principal office and club facilities are located in Jacksonville, Fla. The articles of incorporation set forth its general business purpose to be the construction, ownership, and operation of golf courses, swimming pools, other recreational facilities, a clubhouse, restaurant, and locker rooms.

Petitioner filed its corporate Federal income tax return for the taxable year 1966 with the District Director of Internal Revenue, Jacksonville, Fla., on May 19, 1967, pursuant to an automatic extension. Petitioner filed its returns for the taxable years 1968 and 1970 with the Southeast Service Center, Chamblee, Ga. Respondent's statutory notice of deficiency was mailed to petitioner on March 1, 1972.

The articles of incorporation of the club, approved by and filed with the secretary of state of Florida November 10, 1965, authorized 100 shares of no-par class A stock and 500 shares of $1 par value class B stock. The rights specifically accorded the owners of class A and class B stock in the articles of incorporation are as follows:

### ARTICLE III

#### [CLASS A.]

There shall be two classes of stock; Class A Stock, which shall be voting stock, and shall be of no par value and may be issued in fractions of a share. Class A stock shall be fully paid and non-assessable and may be issued wholly or in part for cash, services, labor or for the purchase of property or contracts at a just valuation to be fixed by the Board of Directors. The holders of Class A stock

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

shall at all times elect eighty per cent (80%) of the Board of Directors of this corporation. The maximum number of shares of Class A stock that the corporation is authorized to have outstanding at any time is one hundred (100) shares. In the event of liquidation, either voluntary or involuntary, of this corporation, one (1) share of Class A stock shall be equal to five (5) shares of Class B stock.

### [CLASS B.]

Class B stock shall be of the par value of One Dollar ($1.00) per share and shall be fully paid and non-assessable. The holders of Class B stock shall at all times elect twenty per cent (20%) of the Board of Directors of this corporation. Class B stock shall not be transferable except upon the approval of the majority of the holders of Class A stock. Class B stock shall have no pre-emptive rights and the corporation may issue and sell stock of either class from time to time without offering such shares to the stockholders then holding shares of Class B stock. In the event of liquidation, either voluntary or involuntary, of this corporation, five (5) shares of Class B stock shall be equal to one (1) share of Class A stock. The maximum nuber [number] of shares of Class B stock that the corporation is authorized to have outstanding at any time is 500 shares.

The class B stock certificate states on its face that "Class B stock shall not be transferable except upon the approval of the majority of the holders of Class A stock." There are no restrictions as to the transferability of class A stock.

The membership of the club was, and continues to be, composed of four classes: general founder member (founder), general, golf, and pool. The rights, duties, privileges, and obligations of each member class as set forth in the club rules, the minutes of the board of directors meeting for November 11, 1965, and a membership brochure were as follows:

### CLUB RULES

A. MEMBERSHIP.
* * *.

GENERAL FOUNDERS MEMBERSHIP. [Founders] A member holding one or more shares of class B stock. This membership entitles unlimited use by member, wife and all unmarried family members under 25 years of age, of golf course, pool, and club facilities. This type of membership is limited to 400 members. Membership is subject to annual renewal fee and monthly dues.

GOLF MEMBERSHIP. Initiation Fee, and annual renewal fee. Monthly dues plus federal and state taxes. Initiation fee non-refundable, non-transferable. Unlimited use of golf course by member and wife, all unmarried family members under 25 years of age.

POOL MEMBERSHIP. Initiation fee, and annual renewal. No monthly billing. Annual fee entitles member unlimited use of pool and all other club facilities with exception of golf course.
* * *

4. CLASS B STOCK. Founder members are holders of Non-assessable Class B stock. Founder members elect one director to Corporate board. Class B stock may be transferred after one year. Sale of founder stock is the sole responsibility of the member. Holder of Class B stock is eligible for club membership subject to approval of membership committee.

[General Membership information was not included in the club rules.]

## MINUTES

### MEETING OF BOARD OF DIRECTORS

### NOVEMBER 11, 1965

* * *

1. FOUNDER MEMBER. A Founder Membership would be limited to 500 in number of which 300 would be available to the general public. The remaining 200 members would be held for Lynn Development Corporation and Kemp Development Corporation for undeveloped residential lots in the vicinity of the golf course. These memberships would be available to the lot purchasers. However, they would be subject to the regular screening requirements of any other type member. The Founder Member would receive one share of Class "B" non-assessable non-profit sharing stock. Class "B" stockholders initiation fee would be $350 with an annual renewal fee of $125 plus a monthly dues of $15. Class "B" stockholders would elect one director as subscribed [prescribed] by the By-Laws.

2. GENERAL MEMBER. General Members would be accessible to all facilities of the country club. Initiation fee $350, annual renewal fee $125 and monthly dues $15.

3. POOL MEMBER. Initiation fee $200, annual renewal fee $50 per year. No monthly dues. Pool Members are limited to use of the pool area and club house facilities only.

[Golf membership information was not included in the minutes.]

### MEMBERSHIP [Brochure.]

GENERAL MEMBERSHIP. $350.00 Initiation Fee. $125.00 Annual Fee. $15.00 Monthly dues. (all plus federal & state taxes.) Un-limited use by member, wife and all family persons, single under 25 years of age, of golf course, pool, tennis and club house facilities.

GOLF MEMBERSHIP. $250.00 Initiation Fee. $100.00 annual Fee. Monthly dues $15.00 plus federal and state taxes. Un-limited use of golf course by member and wife, all family persons single and under 25 years of age. This includes tennis and club house facilities.

POOL MEMBERSHIP. $200.00 Initiation Fee. $50.00 annual dues. No monthly billing. Member and family un-limited use of pool and club house facilities with exception of golf course.

[Founder membership information was not included in the brochure.]

The general, golf, and pool members do not have the right to participate in the proceeds of liquidation, receive dividends,

transfer their memberships, or elect a member of the board of directors.

The class A stock was issued for $30,000 as follows:

| Holder | Number of shares | Date issued | Relationship of holder to University Club |
|--------|------------------|-------------|-------------------------------------------|
| Rufus L. Sanders and Betty J. Sanders, jointly | 25 | 1/1/67 | President and secretary-treasurer, husband and wife |
| Betty J. Sanders | 25 | 1/1/67 | Secretary-treasurer |
|  | 25 | 2/12/68 |  |
| Andrea K. Solomon | [1]7 | 1/1/67 | None |
| Harry Kemp Anderson, Jr. | [1]7 | 1/1/67 | Vice president |
| Harry K. Anderson and Erma M. Anderson, jointly | [1]11 | 1/21/67 | Vice president and wife |

[1] These three stock certificates, totaling 25 shares, were initially issued as shown above; however, these 25 shares were later purchased by Betty L. Sanders, Lester F. Sanders, and Hattie E. Fraley, jointly and are now held in escrow as security for payment of the purchase price agreed upon with the record owners of that stock as shown above. Said parties being the daughter, son, and mother-in-law of Rufus L. Sanders.

The class B stock was issued from 1966 through 1970 as follows:

| Taxable year | Shares sold |
|--------------|-------------|
| 1966 | 321 |
| 1967 | 17 |
| 1968 | 29 |
| 1969 | 10 |
| 1970 | 6 |
| Total | 383 |

It was planned that 300 of the 500 shares of the class B stock authorized were to be offered and sold to the general public in 1966. The remaining 200 shares were to be held by the club for subsequent sale to future owners of residential lots planned for development in the vicinity of the golf course.

In 1966 other classes of nonshareholder-members paid initiation fees as follows:

| Class | Number accepted | Amounts paid |
|-------|-----------------|--------------|
| General | 20 | $7,000 |
| Golf | 3 | 750 |
| Pool | 43 | 8,600 |
| Total |  | 16,350 |

Petitioner conspicuously typed in the words "Initial Return" on the first page of its U.S. Corporation Income Tax Return, Form 1120, for the taxable year 1966. In addition to petitioner's

typed-in notation, the first page of the return was stamped in bold print by the Internal Revenue Service with the word "Accepted." Petitioner entered the $112,350 received from founder members and the $16,350 received from general, golf, and pool memberships on page 4 of the return under Schedule L, which is headed "Balance Sheets," as follows:

LIABILITIES AND CAPITAL

\* \* \*

| 21 | Capital stock: (a) Common stock A_____ | $30,000 | |
| | (b) Common stock B_____ | 112,350 | $142,350 |
| 22 | Paid-in or capital surplus \* \* \* _____ | | 16,350 |

Petitioner attached a schedule in reconciliation of the capital surplus account as follows:

| General memberships _____ | $7,000 |
| Pool memberships _____ | 8,600 |
| Golf memberships _____ | 750 |
| Total _____ | 16,350 |

In response to questions on page 3 of the return, petitioner identified its "principal business activity" as "Country Club" and its principal product or service as "Golfing, Amusements and Other Recreational Services." It also responded with "N/A" to the question of the "Amount of taxable income (or loss) for: 1963, 1964, 1965." Its gross receipts from sales was $117,417.17 and gross income was $120,191.18.

Petitioner filed a document entitled "Corporation Report and Tax Return for Foreign and Domestic Corporations" with the Florida Revenue Commission. The report requires payment of a tax on the value of shares outstanding. For the taxable year 1966, petitioner listed the total value of the outstanding class B stock at $112,350 or $350 for each share outstanding. For the taxable years 1967 through 1969, it listed the value of the outstanding class B stock at its $1 par value for each share outstanding.

To determine eligibility for membership, the board of directors created a screening committee. The screening committee considered acceptance of membership applications from both nonshareholders and class B shareholders who desired membership. Most class B shareholders sought to become founder members but there were some class B shareholders who were only pool members. Class B shareholders, upon becoming members,

were required to pay annual renewal fees and monthly dues as determined by the class of membership obtained. Class B shareholders becoming founder members did not pay a $350 initiation fee in addition to their $350 payment for class B stock. All class B shareholder applications for membership were accepted and the class A shareholders have never denied a requested transfer of class B stock. The sale of a share of class B stock automatically terminated membership. No one individual was issued more than 1 share of class B stock.

The club maintained a waiting list of individuals desiring to purchase class B stock. The club supplied the names of willing sellers of class B stock to prospective purchasers but the club itself would not buy back the class B stock. A Mr. Napier sold his stock in 1973 for $400, and considered the purchase of his stock to be for the "privilege of using the golf course." Although the president of the club, Rufus Sanders, testified that membership had never been closed, when Mr. Napier sought membership in 1972, he was informed by the club that he could not be a member unless he purchased stock. Another individual understood that he had full privileges of the club by reason of his stock ownership and that the stock certificate entitled him to a one one-thousandth interest in the club in the event of liquidation.

Although the class A shareholders were guaranteed the right to elect 80 percent of the board of directors by the articles of incorporation, the bylaws provided for four directors, three elected by class A shareholders and one elected by the class B shareholders. A quorum of two members of the board of directors was required to conduct business. The manner in which the class B shareholders exercised their right to vote for their member on the board of directors involved placing a ballot box in the club-house for several days. The class B shareholders exercised their voting rights by placing their ballot in the box. Class A and B annual stockholder meetings were not held jointly. Class B share-holders did not attend the class A annual stockholders meeting since the meeting was intended for class A shareholders only. Written notice of the annual stockholder meetings was mailed only to class A shareholders. The bylaws provided for one annual stockholder meeting.

The club owned less than 10 acres of land but obtained two ground leases with options to purchase. Construction of the golf course and physical facilities was commenced in 1965. The golf

course was sufficiently completed to be opened for use on July 4, 1966. It was anticipated that at the opening the condition of the golf course would accommodate about 300 golfers. The club overcommitted itself in 1966 by accepting too many general founder members. Financing for the construction was obtained by a loan and mortgage on September 20, 1965, by Rufus Sanders and his wife, as individuals. They agreed in the mortgage agreement with the financial institution as follows:

It [the mortgagor] further warrants, covenants and represents that the purpose of the construction of said improvements is for the purpose of providing a swimming and golfing facility on a membership basis to qualified individuals; and that it will, as soon as said improvements are constructed and within the times hereinabove set forth, use the mortgaged premises and operate the same and the improvements to be constructed thereon as a private membership club. It [the mortgagor] further covenants and undertakes that as a condition to being admitted to membership in said club, it will charge an initiation fee of not less than $250.00 for each golf-playing member and an initiation fee of not less than $200.00 for each swimming club member. * * *

Prior to adoption of the articles of incorporation, the attorney for petitioner conferred with responsible officials at the mortgage institutions and obtained an assurance that the substitution of the sale of class B stock at $350 instead of an initiation fee of $250 would not be considered a default or breach of the covenant.

The contested depreciable items for the taxable years 1966, 1968, and 1970 are as follows:

| Item | Cost | Estimated life | Depreciation claimed | | |
|------|------|------|------|------|------|
| | | | 1966 | 1968 | 1970 |
| Golf course ___ | $124,132.76 | 33 years | $1,880.80 | $3,724 | $3,724 |
| Grass _____ | 20,699.96 | 5 years | 2,070.00 | 4,188 | 4,188 |
| Driving range _ | 1,000.00 | 33 years | 15.15 | 33 | 33 |

The Commissioner, in his statutory notice of deficiency, determined that petitioner should have included in taxable gross receipts amounts received for sales of the shares of class B stock in excess of its par value of $1 per share. He also determined that petitioner was not entitled to a deduction for depreciation on the golf course, grass, and driving range because such items are not subject to depreciation under the provisions of section 167.

### OPINION

The Commissioner mailed his statutory notice of deficiency more than 3 years after petitioner filed its initial income tax return for the taxable year 1966. Petitioner contends that assess-

ment for that year is barred by the running of the 3-year period of limitations provided in section 6501(a) of the Code and respondent counters with the contention that petitioner omitted more than 25 percent of the gross income on the return and, therefore, the 6-year period of limitations provided for in section 6501(e) of the Code applies. Petitioner meets respondent's argument for the 6-year period of limitations by reliance upon section 6501(e)(1)(A)(ii).[2] To prevail, petitioner must prove that the income tax return for 1966 contained a statement adequate to apprise the Commissioner of the nature and amount of the item omitted.

The question of whether such a statement is adequate is factual. The omitted item within the meaning of section 6501(e) upon which each party relies for his position is purported income which the Commissioner determined to be unreported from the sales by petitioner of its class B capital stock. Respondent contends that the proceeds from the sales of such stock represent taxable income because the stock, in substance, is a license for the privilege of using petitioner's facilities.

Petitioner's income tax return for the taxable year 1966 was identified by petitioner on its face by the term "Initial Return." The balance sheet portion contained no balance sheet for the beginning of its taxable year. The principal business activity of petitioner was described as "Country Club" and its principal product or service was listed as "Golfing, Amusements and Other Recreational Services." It indicated on the return, in response to the question of its taxable income for 1963, 1964, and 1965 such question to be "N/A" (not applicable). Petitioner reported gross receipts of $117,417.17. On the balance sheet for the close of the taxable year petitioner reported class A common capital stock in

---

[2] SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION.

(e) SUBSTANTIAL OMISSION OF ITEMS.—Except as otherwise provided in subsection (c)—

    (1) INCOME TAXES.—In the case of any tax imposed by subtitle A—

      (A) GENERAL RULE.—If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. For purposes of this subparagraph—

        * * *

      (ii) In determining the amount omitted from gross income, there shall not be taken into account any amount which is omitted from gross income stated in the return if such amount is disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the Secretary or his delegate of the nature and amount of such item.

the amount of $30,000, class B common capital stock in the amount of $112,350, and paid-in capital surplus in the amount of $16,350. Petitioner attached the following schedule in reconciliation of the capital surplus account:

| | |
|---|---|
| General memberships | $7,000 |
| Pool memberships | 8,600 |
| Golf memberships | 750 |
| Total | 16,350 |

Listed among its "Other Assets" schedule, petitioner indicated "Stock Subscriptions Receivable" of $30,000.

The narrow question to be decided under section 6501(e)(1)(A)(ii) is whether the descriptions on the income tax return enumerated above were sufficient to apprise the Commissioner of the nature and amount of the adjustment he made whereby he determined that the receipts from the sale of class B stock represented taxable income to petitioner instead of nontaxable receipts of funds from the sale of its own capital stock. We conclude, as a factual determination, that the information contained on the return was adequate to so apprise the Commissioner.

Although the question is factual and many cases, therefore, are distinguishable because they are factually different, some leading cases provide guidelines and tests which are helpful in arriving at a factual conclusion. The landmark case is *Colony, Inc. v. Commissioner*, 357 U.S. 28 (1958). In that case the Supreme Court laid down the basic test which was codified in section 6501(e)(1)(A)(ii). The Court stated (357 U.S. at 36):

> We think that in enacting [section] 275(c) [now section 6501(e)] Congress manifested no broader purpose than to give the Commissioner an additional two years [now 3 years] to investigate tax returns in cases where, because of a taxpayer's omission to report some taxable item, the Commissioner is at a special disadvantage in detecting errors. In such instances the return on its face provides no *clue* to the existence of the omitted item. On the other hand, when, as here, the understatement of a tax arises from an error in reporting an item disclosed on the face of the return the Commissioner is at no such disadvantage. And this would seem to be so whether the error be one affecting "gross income" or one, such as overstated deductions, affecting other parts of the return. * * * [Emphasis added.]

It appears to us that reporting the dollar value of class B stock on the balance sheet of the initial return rather than classifying the

proceeds from the sale of stock as income is a type of disclosure described by the Supreme Court.

The Court of Appeals for the Fifth Circuit, to which an appeal in the instant case would lie, held, as the Supreme Court held in *Colony, Inc.,* in *Davis v. Hightower,* 230 F.2d 549 (5th Cir. 1956).[3] Some of the language of that opinion (p. 553) is particularly appropriate here:

> The only way in which the taxpayer here could satisfy the government's requirement that he state his "gross income" in a way to permit a tax computation of the amount the government claims is due, would be for him to abandon his claim that he was entitled to capital gains treatment of the sales in question. No such penalty was intended by Congress in extending the statutory period to five years in case of substantial omission. It cannot be thought that if a taxpayer accurately fills in every blank space provided for his use in the income tax form, giving every "gross" or maximum figure called for, and arrives at an incorrect computation of the tax only by reason of a difference between him and the Commissioner as to the legal construction to be applied to a disclosed transaction, the use of a smaller figure than that ultimately found to be correct in one stage of the computation amounts to an omission from "gross income" of the difference between the correct and incorrect item.

It is difficult to see what additional entry petitioner could have made on its income tax return to apprise the Commissioner that it issued stock which the Commissioner might determine to be income. *Lazarus v. United States,* 136 Ct. Cl. 283, 142 F.Supp. 897 (1956). The total amounts received for the stock were shown and it was obvious that the return covered the initial tax-reporting period of petitioner.

We conclude that the breakdown of the capital surplus account on the income tax return constituted the "clue" to which the Supreme Court referred in *Colony, Inc.,* quoted *supra.* The clue does not have to be a detailed revelation of each and every underlying fact. *George Edward Quick Trust,* 54 T.C. 1336, 1347 (1970), affd. per curiam 444 F.2d 90 (8th Cir. 1971). The clue in the instant case was adequate, in light of existing case law, *James Hotel Co.,* 39 T.C. 135 (1962), affd. 325 F.2d 280 (10th Cir. 1963), for the Commissioner to observe, heed, and investigate and a reasonable followup on such clue would lead to the adjustment that he ultimately made. *Benderoff v. United States,* 398 F.2d 132, 137 (8th Cir. 1968).[4]

---

[3] We approved *Davis v. Hightower,* 230 F.2d 549 (5th Cir. 1956), and applied the quoted language with approval to taxable years to which sec. 6501(e)(1)(A)(ii) applied. *Genevieve Walker,* 46 T.C. 630 (1966).

[4] See also *Electra Radio, Inc.,* T.C. Memo 1958-132.

Respondent elicited the testimony of the internal revenue agent who examined petitioner's return for 1966 and he stated that the adjustment did not become apparent to him from the face of the return. This is not the test. The proper application of the rule is whether an adjustment might be apparent from the face of the return to the elusive "reasonable man" and we hold that the entries on the 1966 income tax return were adequate for such purposes.

Accordingly, we hold that petitioner has satisfied the requirements of section 6501(e)(1)(A)(ii) and assessment of additional income tax for the taxable year 1966 was barred by the expiration of the 3-year period of limitations when the Commissioner mailed his statutory notice of deficiency. The cases relied upon by respondent for the proposition that petitioner's disclosure on the return was not adequate under section 6501(e)(1)(A)(ii) are factually distinguishable and do not establish guidelines different from the ones we applied here.

The issue remains for the taxable years 1968 and 1970 whether proceeds received from the sales of class B common stock in those years represent taxable income. This issue is also factual. Respondent contends that $349 of the $350 paid by the class B shareholders for their stock represented, in substance, payment for the privilege of using the club facilities in the future taxable as ordinary income. Petitioner contends it is contribution to the capital of the corporation.

The substance, not the form, of the transaction controls the incidence of taxation. *Commissioner v. Hansen*, 360 U.S. 446 (1959). Respondent relies primarily upon *James Hotel Co., supra.* We held in that case that receipts from the sale of stock in a private club were in exchange for the privilege of using the club's facilities and represented taxable income. That case is factually distinguishable but it provides tests to be applied in similar factual situations.

In *Affiliated Government Employees' Distributing Co. v. Commissioner*, 322 F.2d 872 (9th Cir. 1963), affg. 37 T.C. 909 (1962), cert. denied 376 U.S. 950 (1964), the court stated:

Petitioner contends that motive or intent of the purchaser has no relevance to the determination whether "stock" has been purchased. If no question were raised as to the substance of the interests or rights which allegedly qualified the members as "stockholders," we would be inclined to agree with petitioner. Here, however, we feel that the issue is whether the members received any interest of

substance in the corporation other than the privilege to buy at discount. In resolving this issue, we feel that the Tax Court was justified in considering all of the circumstances surrounding the purchase of memberships, including the motives or purposes of the parties to the transaction. * * * [322 F.2d at 877.]

There was testimony in the instant case that class B shareholders considered ownership of the class B stock to be for the privilege of using the golf course and that the privilege of using the club was based upon ownership of the stock. Petitioner, through the testimony of its founder, Mr. Sanders, attempted to establish that class B shareholders made contributions to the capital of the corporation but petitioner did not offer the testimony of any class B shareholder that such was the intent at the time the stock was purchased. Mr. Sanders, obviously interested in the outcome of this case and, therefore, biased, consistently testified beyond the scope of the questions asked him on the witness stand to such an extent that it was necessary to admonish him on more than one occasion that he was to answer only the question that was asked. We conclude that any inferences from his testimony as to the intent of class B shareholders would be unwarranted. Moreover, he testified that membership had never been closed but a Mr. Napier, who sought membership in 1972, was told that he could not join the club unless he purchased stock.

The totality of the indicia of ownership of class B stock does not bespeak of investment in a corporate enterprise. In arriving at such a conclusion it must be assumed that a prospective purchaser would have knowledge of all the facts necessary to base a business judgment on investing in class B common stock. Class B shareholders had virtually no voice in the management of the corporation. The articles of incorporation granted them the power to elect 20 percent of the board of directors but the first director to represent the class B shareholders was appointed by the class A shareholders and was never replaced. The class B shareholders were not given notice of the annual meeting of shareholders at which time the class A shareholders elected the directors. Instead, a ballot box was placed in the clubhouse for the class B members to vote for their director. The bylaws provide for an annual meeting of shareholders, not specifying any distinction by class except as to voting for directors yet 51 percent of the outstanding stock entitled to vote constituted a quorum for doing business. The right of a shareholder to vote is not limited to voting for directors. All shareholders have the

right to vote for amending the bylaws, call for special meetings of the shareholders, elect inspectors for elections, and apparently to vote for any other matter that might come before the shareholder meeting. Class B shareholders were not given notice of the meetings of the shareholders. Based on all the evidence it is clear that in operation the class A shareholders (the Sanders group) controlled and operated the corporation. Class B stock could not be transferred without the approval of a majority of the holders of class A stock but no such restriction was imposed on class A stock. Club rules prohibited transfer of class B stock for 1 year after purchase. Class B stock had no preemptive rights and the corporation could not issue more than 300 shares. The articles of incorporation authorized 100 shares of class A stock with no restriction as to preemptive rights and provided that it could be issued for "cash, services, labor or for the purchase of property or contracts at a just valuation to be fixed by the Board of Directors." No such authority was extended to the issuance of class B stock.

In the event of liquidation, 5 shares of class B stock were equal to 1 share of class A stock. In view of the lack of preemptive rights of the class B shareholders, their interest in liquidation could be diminished. Class A shareholders paid $300 per share for their stock. Class B shareholders paid $350 per share for their stock but would only receive one-fifth as much upon liquidation as a class A shareholder.

All of the corporate minutes of the meetings of the board of directors in evidence are signed by the directors elected by the class A shareholders (only members of the Sanders family); none are signed by the director for the class B shareholders, although the minutes recite that such director attended some of the meetings.

No distinction was drawn between the classes of stock as to dividend rights but no dividends were declared or paid during the years before the Court. Minutes of the board of directors describe the class B stock as "non-profit sharing stock." Declaration of dividends, however, depends upon control of the corporation which we discussed above.

Sale of class B stock terminated the owner's membership in the club. This factor demonstrates the close relationship between the ownership of stock and use of the club's facilities.

We conclude, therefore, that the class B stock did not represent a proprietary interest in petitioner but, instead, represented the privilege of using the club's facilities. The proceeds of the sales of such stock are, therefore, ordinary income to petitioner. Respondent concedes that $1 of $350 paid for each share of stock is, in substance, for stock; therefore, the remaining $349 per share is ordinary income to petitioner.

Petitioner claimed depreciation on its return for the taxable years before us on its golf course, grass, and driving range, all of which was disallowed by the Commissioner in his statutory notice of deficiency. Respondent's disallowance is based upon the lack of a determinable useful life of the assets and the proposition that such assets constitute land.

Petitioner offered the testimony of its accountant who explained the useful lives he determined in claiming the depreciation deduction. He was admittedly not an expert on the useful lives of such assets. Such proof is inadequate to overcome the presumptive correctness of the Commissioner's determination disallowing the depreciation deduction. *Welch v. Helvering,* 290 U.S. 111 (1933). The Commissioner's determination as to depreciation disallowed, is, therefore, sustained except for the taxable year 1966 which is barred from assessment of additional tax.

*Decision will be entered under Rule 155.*