T.C. Memo. 1997-124


UNITED STATES TAX COURT


CHARLOTTE AIRCRAFT CORPORATION AND SUBSIDIARIES, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 2582-96.                    Filed March 11, 1997.


G. Edward Hinshaw, Jr. and W. Curtis Elliott, Jr., for
petitioner.

Frank C. McClanahan III, for respondent.


MEMORANDUM OPINION


HAMBLEN, Judge: This matter is before the Court on
petitioner's motion for partial summary judgment. Unless
otherwise indicated, all section references are to the Internal
Revenue Code in effect for the taxable years at issue, and all
Rule references are to the Tax Court Rules of Practice and

Procedure.  In the notice of deficiency, respondent determined deficiencies in petitioner's Federal income tax in the following amounts:

| Taxable Years Ending Sept. 30 | Deficiency |
| --- | --- |
| 1987 | $175,870 |
| 1988 | 17,909 |
| 1989 | 15,048 |
| 1990 | 187,808 |
| 1991 | 289,879 |
| 1992 | 15,402 |

The issue on which petitioner has moved for partial summary judgment is whether petitioner is entitled to deductions for interest pursuant to section 163 for taxable years ending September 30, 1990, through September 30, 1992.

Pursuant to Rule 121, petitioner filed an affidavit with exhibits in support of its motion for partial summary judgment. Respondent filed a written response with an affidavit and exhibits opposing petitioner's motion.

Rule 121(b) provides that a motion for summary judgment is to be granted if "there is no genuine issue as to any material fact and * * * a decision may be rendered as a matter of law." The disposition of a motion for summary judgment under Rule 121(b) is controlled by the following principles:  (a) The moving party must show the absence of dispute as to any material fact and that a decision may be rendered as a matter of law; (b) the factual materials and the inferences to be drawn from them must

be viewed in the light most favorable to the party opposing the motion; and (c) the party opposing the motion cannot rest upon mere allegations or denials but must set forth specific facts showing there is a genuine issue for trial. O'Neal v. Commissioner, 102 T.C. 666, 674 (1994).

A motion for summary judgment will be granted if the Court is satisfied that no real factual controversy is present so that the remedy can serve "'its salutary purpose in avoiding a useless, expensive and time consuming trial where there is no genuine, material fact issue to be tried.'" Casanova Co. v. Commissioner, 87 T.C. 214, 217 (1986) (quoting Lyons v. Board of Educ., 523 F.2d 340, 347 (8th Cir. 1975)).

Solely for the purposes of disposing of petitioner's motion, we set forth a summary of the facts relevant to our discussion. Rule 121(b); Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), affd. 17 F.3d 965 (7th Cir. 1994).

Charlotte Aircraft Corp. (CAC) is a corporation which was duly formed under the laws of the State of North Carolina in or about September 1953, for the purpose of buying and selling transport category aircraft, aircraft engines, and aircraft parts. In 1986, CAC formed Caldwell Aircraft Trading Co. (CATCO) as a wholly owned subsidiary to buy, sell, lease, and broker aircraft and aircraft engines.

CATCO contacted Security Pacific Equipment Leasing, Inc. (SPELI), a subsidiary of Security Pacific Bank. SPELI had

experience in the leasing and financing of fleets of aircraft. CATCO and American Airlines (American) agreed that CATCO would purchase from American 36 Boeing Model 727-023 aircraft, each with 3 Pratt & Whitney JT8D-7B turbofan engines (36 aircraft), and executed a letter of intent, dated April 6, 1990, and an aircraft purchase agreement, dated June 8, 1990. The purchase price per aircraft was $733,333.33, and the aggregate purchase price was $26,400,000. At the time of the agreement, the fair market value of an average Boeing 727-023 was $2 million, and the cost of a "D" check, a very extensive routine maintenance check, was $1.2 million.

CATCO executed a secured promissory note, dated June 27, 1990, with SPELI for the entire purchase price. The promissory note provided for repayment of the loan, with interest at a rate of 12 percent per annum, in 16 installments due on the following dates:

| Due Dates | Principal Payment |
|---|---|
| 9/1/92 | $733,333.33 |
| 10/1/92 | 733,333.33 |
| 1/1/93 | 1,466,666.67 |
| 2/1/93 | 1,466,666.67 |
| 3/1/93 | 1,466,666.67 |
| 8/1/93 | 1,466,666.67 |
| 9/1/93 | 2,933,333.32 |
| 10/1/93 | 1,466,666.67 |
| 11/1/93 | 1,466,666.67 |
| 1/1/94 | 1,466,666.67 |
| 2/1/94 | 733,333.33 |
| 3/1/94 | 1,466,666.67 |
| 9/1/94 | 2,199,999.99 |
| 10/1/94 | 2,933,333.34 |
| 11/1/94 | 2,933,333.32 |
| 1/1/95 | 1,466,666.68 |

As a condition to entering the transaction, SPELI required CATCO and CAC to enter into a remarketing agreement, an assignment agreement, and a lease with American. The remarketing agreement provided that in the event that CATCO was unsuccessful in selling the aircraft prior to delivery from American, SPELI could require CATCO to transfer one or more aircraft to CAC for the disassembly and sale of the aircraft and parts. SPELI also required CAC to assume the debt attributable to such aircraft when it acquired an aircraft to disassemble. Using its best efforts, CAC agreed to sell the disassembled parts at not less than 25 percent below CAC's estimated price for such a part. If SPELI did not accept CAC's estimated prices, its only contractual remedy was to terminate the remarketing agreement, leaving CAC with no further liability. The remarketing agreement also provided for the allocation of the proceeds between the parties from the sale of any aircraft or parts. The remarketing agreement first allocated the proceeds to the amounts due under the promissory note, with any excess allocated 55 percent to CATCO and 45 percent to SPELI. The assignment agreement required CATCO to assign all of its rights under the aircraft purchase agreement as security to SPELI.

The lease agreement provided for CATCO to lease the 36 aircraft to American for the remaining period of use in accordance with American's "phase-out" schedule for each aircraft. The lease contained a lease rate of $1 per month per

aircraft. CATCO and CAC did not consider the economic realities of the transaction to be those of a lease, and no provision was made for the fair rental value of the aircraft, which was $60,000 per month per aircraft. CATCO and American entered the lease agreement on June 8, 1990. American actually paid $1,000 in rent for all 36 aircraft.

CATCO did not pay the first installment payment due September 1, 1992. SPELI notified CATCO by telephone and by letter that CATCO was in default and demanded payment of the principal, interest, and late charges then due. CATCO continued to look for potential buyers or lessees for the aircraft.

During that time, the U.S. Postal Service awarded a contract to Postal Air, Inc. (Postal Air). CATCO and Postal Air entered into a sales agreement in which Postal Air agreed to purchase 16 of the 36 aircraft from CATCO for a total purchase price of $17,600,000. The day after CATCO signed the contract with Postal Air, Emery Worldwide Airlines, Inc. (Emery), sought and was granted a preliminary injunction preventing Postal Air and the U.S. Postal Service from performing their contract.

The litigation between Emery and Postal Air was settled in March 1993. As part of the settlement, Emery agreed to assist Postal Air in meeting its obligations to CATCO. The settlement agreement, dated March 28, 1993, required Emery to purchase eight aircraft from CATCO for a total purchase price of $8,800,000 and

to make an additional $3 million for CATCO's expenses (Emery settlement).

On April 14, 1993, SPELI again notified CATCO of its failure to make the installment payments. On April 15, 1993, SPELI notified CATCO that it was declaring the note to be immediately due and payable for the unpaid balance of principal, interest and late charges in the amount of $36,505,715.15

On April 23, 1993, CATCO paid $11,318,575.52 to SPELI from the proceeds of the settlement with Emery. A dispute arose regarding whether this payment made CATCO current under the terms of their agreement. On June 4, 1993, SPELI notified CATCO that it would thereafter exercise CATCO's rights under the lease with American.

CATCO failed to make the installment payment due September 1, 1993. On that same day, SPELI again demanded payment from CATCO. On September 7, 1993, SPELI, CATCO, and CAC entered into a settlement agreement in which CATCO conveyed the remaining aircraft to SPELI in exchange for satisfaction of the balance of payments due to SPELI. Under the agreement, SPELI permitted CATCO to retain $500,000 of the proceeds from the prior settlement agreement between CATCO and Emery.

On its consolidated Federal income tax returns for taxable years ending September 30, 1989, through September 30, 1992, respectively, CAC reported that CATCO's liabilities exceeded its

assets by the following amounts:  $885,712, $1,583,164, $5,101,295, $9,045,475.

Petitioner deducted $763,869, $3,354,061, $3,667,803, and $3,514,267 as interest in its consolidated Federal income tax returns for taxable years ending September 30, 1990, through September 30, 1993, respectively.  In the notice of deficiency, respondent disallowed these interest deductions in total.

For the reasons stated below, we agree with respondent that there are genuine issues of material fact in the instant case and consequently will deny petitioner's motion for partial summary judgment.

Section 163 provides that there shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.  In order to be deductible, interest must be paid on genuine indebtedness.  Knetsch v. United States, 364 U.S. 361 (1960).

The "all events" test governs whether an accrual of an expense, including interest, is proper.  See United States v. General Dynamics Corp., 481 U.S. 239, 242 (1987).  Section 461(h)(4) describes the "all events" test as follows:

> All events test.--For purposes of this subsection, the all events test is met with respect to any item if all events have occurred which determine the fact of liability and the amount of such liability can be determined with reasonable accuracy.

Section 461(h)(1) modifies the all events test, providing that "the all events test shall not be treated as met any earlier than when economic performance with respect to such item occurs". Economic performance with respect to interest occurs as the interest cost economically accrues in accordance with the principles of relevant provisions of the Code. Sec. 1.461-4(e), Income Tax Regs.

Petitioner presents three basic arguments. First, petitioner asserts that the substance of the disputed transaction is that of a forward purchase contract and a loan. Second, petitioner contends that the accrued interest due to SPELI was an unconditional fixed obligation, which satisfied the all events test for all the taxable years at issue. Third, petitioner argues CATCO's intrinsic ability or inability to satisfy the loan is irrelevant as to whether the accrued interest is deductible.

Respondent argues that the underlying substance of the transaction is in dispute. Respondent further contends that a reasonable inference may be drawn from all of the facts available that the disputed transaction is a "best efforts" consignment contract with CATCO serving as a sales agent for either SPELI or American and that the interest represents a sharing of profits on resale of the aircraft. Respondent alternatively argues that even if petitioner is correct, the facts are not sufficiently well developed to warrant a finding that the all events test is satisfied. Respondent further argues CATCO's ability to pay

interest is relevant both to determining the true substance of the transaction and to determining whether petitioner was "at risk" for purposes of section 465(b)(4).

We must first address the question of the economic substance of the transaction. In support of her contention that the economic substance of the transaction is in dispute, respondent directs our attention to the fact that the remarketing agreement provided for the sharing of profits between SPELI and petitioner after the principal and interest payments have been made. Respondent also points out that the remarketing and the assignment agreements gave SPELI the ability to control CATCO's possession and custody of the aircraft. Respondent finally asserts that petitioner has failed to explain: (1) Why a reasonable, prudent taxpayer would purchase with borrowed funds $26,400,000 in revenue-producing assets, the aircraft, for which the taxpayer is obligated to begin principal and interest payments in approximately 2 years yet agree to realize only $1,000 over the same period from a lease-back agreement; and (2) why the settlement agreement between SPELI, CAC, and CATCO permitted CATCO to retain $500,000 of the proceeds from the Emery settlement even though CATCO was allegedly in default.

Upon examination of the pleadings, petitioner's motion for partial summary judgment and the affidavits attached thereto, and respondent's response and the affidavits attached thereto, we believe there are genuine issues of material fact critical to the

characterization of the transaction herein.  Resolution of whether a transaction is a loan depends in part on the intent of the parties.  Litton Bus. Sys. Inc. v. Commissioner, 61 T.C. 367, 377 (1973).  The value of a trial with full opportunity to observe the parties and their evidence is obvious.  This is especially so when the question of intent is present.  Preece v. Commissioner, 95 T.C. 594 (1990); Shiosaki v. Commissioner, 61 T.C. 861, 863-864 (1974).  A conclusion as to a taxpayers' intent should not be reached without the benefit of a trial in which the demeanor of the witnesses can be observed and their credibility can be weighed.  Shiosaki v. Commissioner, supra, at 863-864.

In short, the issue is not ripe for summary adjudication. Petitioner's claim is, in effect, that the documentation controls the characterization.  In order to grant petitioner's motion, we would have to accept petitioner's interpretation of the documents relating to the transaction, petitioner's understanding of the transaction as the understanding of all the parties, and petitioner's explanation of any apparent discrepancies.  By petitioner's reasoning, Gregory v. Helvering, 293 U.S. 465 (1935), should have been resolved on a motion for summary judgment because the paperwork documented a reorganization.  It is the substance of the transaction and not the form which must control the consequences for Federal tax purposes.  University Country Club, Inc. v. Commissioner, 64 T.C. 460, 471 (1975).

The resolution of whether the substance of the transaction at issue is a loan may obviate the necessity of deciding whether the all events test is satisfied or whether petitioner's ability to pay interest affects the availability of the deductions. For these reasons, we conclude that petitioners' motion for partial summary judgment must be denied.

<u>An appropriate order will be issued.</u>