# United States Court of Appeals
## For the First Circuit

No. 01-1169

CC&F WESTERN OPERATIONS LIMITED PARTNERSHIP,
CC&F INVESTORS, INC., TAX MATTERS PARTNER,

Petitioner, Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent, Appellee.

ON APPEAL FROM A DECISION OF THE UNITED STATES TAX COURT

[Hon. Mary Ann Cohen, U.S. Tax Court Judge]

Before

Boudin, Chief Judge,

Stahl, Senior Circuit Judge,

and Lynch, Circuit Judge.

William F. Nelson, with whom J. Bradford Anwyll, Christopher
P. La Puma, Nathan E. Clukey, McKee Nelson, Ernst & Young LLP,
Peter J. Genz and King & Spalding were on brief for petitioner.
    Charles Bricken, Tax Division, Department of Justice, with
whom Claire Fallon, Acting Assistant Attorney General, and Bruce
R. Ellisen, Tax Division, Department of Justice, were on brief
for respondent.

December 10, 2001

BOUDIN, Chief Judge. We are asked to resolve whether a tax assessment against CC&F Western Operations Limited Partnership ("Western") was timely filed under a provision of the Internal Revenue Code that gives the IRS three additional years to impose such an assessment on a partnership that omits a substantial amount of gross income from its return. 26 U.S.C. § 6229(c)(2) (1994). The facts, which are fully stipulated, involve the sale of real estate interests in a complicated two-step transaction.

CC&F Investment Company Limited Partnership ("CC&F Investment") and CC&F Investors, Inc. ("CC&F Investors") formed Western in 1990 for the sole purpose of selling certain partnership interests owned by CC&F Investment to Trammell Crow Equity Partners II, Ltd. ("Trammell Crow"). CC&F Investment owned, directly or through its lower-tier partnership CC&F West, two relevant sets of assets: 84 percent general partner interests in seven real estate partnerships ("the real estate partnerships") and 100 percent ownership interests in five vacant land parcels.[1]

---

[1]CC&F Investment also owned--and sold to Trammell Crow--stock in CC&F Stadium Properties, Inc., a corporation involved in real estate leasing. The IRS determined that the gross income on this sale was also under-reported, but neither party contends that this transaction affects the timeliness of the IRS's assessment.

In a tax-free transaction prior to the Trammell Crow sale, CC&F Investment and CC&F West sold Western their 84 percent interest in the real estate partnerships and conveyed the five land parcels to five new partnerships in which Western was a 99 percent partner ("the vacant land partnerships"). The remaining 16 percent interest in the real estate partnerships was held by other partnerships whose partners were primarily employees of CC&F Investment's general partner ("the employee partnerships"); CC&F Investors retained the residual 1 percent interest in the vacant land partnerships.

In two separate transactions in March and April 1990, Western joined with the employee partnerships and CC&F Investors to sell a 100 percent interest in each of the twelve partnerships (collectively, "the subsidiary partnerships") to Trammell Crow for $74,122,212 in cash. Because Trammell Crow was promised the assets free and clear of debt, $52,928,095 of the sale proceeds went directly from the escrow agent to repay all of the third-party bank debt.

As a result of the sale, each of the twelve partnerships underwent a tax termination under 26 U.S.C. § 708(b)(1)(B) and submitted a final tax return for the abbreviated tax year. All but one return included a statement that the partnership had been sold to an unrelated third party

-4-

by Western and the employee partnerships. (One of the seven real estate partnerships--CC&F Bellvue--erroneously stated that all of its interests had been liquidated and transferred <u>to</u> Western.)

Western timely filed its 1990 partnership information return (Form 1065) on October 15, 1991. The return stated that Western had sold "various partnership interests" on March 29, 1990 at a "gross sales price" of $27,965,551 and at a "cost or other basis" of $31,161,890, for a net loss of $3,196,339. No explanation of the derivation of these figures was given. Western also attached the Schedule K-1s from the twelve subsidiary partnership returns, which taken together stated that Western's allocable share of those partnerships' liabilities just prior to the sale totaled $69,959,490.

On October 14, 1997--a day less than six years after Western's return was filed--the IRS sent CC&F Investors, Western's tax matters partner, an adjustment with a proposed increase of nearly $83 million in Western's taxable income from the sale of the twelve partnership interests. This adjustment was later acknowledged to be miscalculated, and the parties now agree that Western's $3,196,339 net loss on the sale should have been reported as a net gain of $9,182,216--an upward adjustment of $12,378,555.

The correct gain was calculated based on gross sale proceeds to Western of $20,904,872 (the $74,122,212 purchase price paid by Trammell Crow minus the employee partnerships' $289,245 share and the $52,928,095 that went to pay off the third-party bank debt). The aggregate tax basis of Western's interest in the twelve partnerships was calculated to be $9,276,412, disregarding the third-party bank debt (which had also been disregarded in calculating Western's proceeds). Certain other costs were also attributed to the sale. The exact calculations appear in an appendix to this opinion.

Western concedes that this adjustment is accurate but contends that the adjustment was not timely filed. It argues that the statutory three-year extension for substantial omissions of gross income does not apply because its gross income was adequately disclosed on its return and attached schedules. On cross-motions for summary judgment, the Tax Court sustained the IRS, 80 T.C.M. (CCH) 345 (2000), and this appeal ensued. We have jurisdiction, and our review is de novo. 26 U.S.C. § 7482; State Police Ass'n of Mass. v. Comm'r, 125 F.3d 1, 5 (1st Cir. 1997).

The limitations provisions that directly govern are contained in sections 6229(a) and (c) of the 1954 Code, enacted as part of the Tax Equity and Fiscal Responsibility Act of 1982

-6-

("TEFRA"), Pub. L. No. 97-248, § 402, 96 Stat. 324, 648. Under TEFRA, tax treatment of partnership items is determined in a unified partnership level proceeding, although assessments occur at the individual partner level.

Section 6229(a) says that the limitations period for assessing tax on a taxpayer, where the tax is attributable to a partnership item, does not expire before three years after the partnership return was filed. Section 6229(c) then creates certain extensions, including one in subsection (c)(2) for "[s]ubstantial omission of income":

> If any partnership omits from gross income an amount properly includible therein which is in excess of 25 percent of gross income stated in its return, subsection (a) shall be applied by substituting "6 years" for "3 years".

In this case, notice of an adjustment tolling the statute was sent to Western's tax matters partner one day before the six-year period expired. If the six-year period governs, the parties have stipulated that additional tax from Western on the under-reported income is now due. The parties also stipulate that the 25 percent threshold has been met. Whether one compares actual gross proceeds with reported gross proceeds, or real net gain with reported net loss, the actual amounts involved exceed the reported figures by far more than 25 percent. See Appendix.

Based on the bare language of section 6229, it might appear that this alone is enough to entitle the IRS to the six-year statute of limitations.  However, Western has two counter-arguments to the IRS, both of which depend on reading section 6229 in light of case law developed in connection with two other provisions--section 275 of the 1939 Code and section 6501 of the 1954 Code.  The arguments can scarcely be understood, let alone assessed, without an excursion into pre-TEFRA law and precedent.

Language embodying section 6229's substantial omission test was originally contained in section 275 of the 1939 Code to qualify the ordinary three-year limitations period for all income tax returns and not just partnerships; the only difference was that the extension provided was from three years to five years rather than six.  In 1954, Congress superseded section 275 with section 6501.  Subsection 6501(a) adopts the normal three-year period; subsection (e)(1) adopts the substantial omission test extending the period to six years but also adds two further subsections not contained in section 275 providing special rules for implementing the test.  26 U.S.C. § 6501(e)(1)(A)(i), (ii).

Not long after the 1954 Code was enacted, the Supreme Court in Colony, Inc. v. Commissioner, 357 U.S. 28 (1958), construed section 275 as applied to a pre-1954 Code return.  In

-8-

Colony, the case around which Western's main arguments revolve, the taxpayer reported the sale of several lots of land, giving the full amount of the gross receipts from the sales but overstating its basis in the property, resulting in an understatement of gross income. Relying upon legislative history of section 275, Justice Harlan held that its longer limitations period did not apply where gross receipts had been fully reported, even though gross income was substantially under-reported. Id. at 33.

The result may seem surprising because section 275 did not speak of gross receipts at all but of gross income, and taxpayer Colony had under-reported gross income by more than 25 percent by overstating the basis. Gross income on land sales is normally computed as net gain after subtracting the basis. 26 U.S.C. §§ 61(a)(3), 1001(a); 26 C.F.R § 1.61-6 (2001). However, Justice Harlan read section 275 in light of legislative reports and debates giving examples of cases where an income receipt was entirely omitted from the return. Colony, 357 U.S. at 33-35. Although these could have been deemed merely examples, Colony read them as reflecting the limits of section 275.[2]

---

[2]Whether Colony's main holding carries over to section 6501(e)(1) is at least doubtful. That section's first "special rule" adopts Justice Harlan's gross receipts test but only for sales of goods and services. 26 U.S.C. § 6501(e)(1)(A)(i). The arguable implication is that it does not apply under section

Justice Harlan's decision concluded with the following:

> We think that in enacting § 275(c) Congress manifested no broader purpose than to give the Commissioner an additional two years [now increased to three] to investigate tax returns in cases where, because of a taxpayer's omission to report some taxable item, the Commissioner is at a special disadvantage in detecting errors. In such instances the return on its face provides no clue to the existence of the omitted item. On the other hand, when, as here, the understatement of a tax arises from an error in reporting an item disclosed on the face of the return the Commissioner is at no such disadvantage.

357 U.S. at 36.

Western's first argument based upon Colony is straightforward. It says that Colony is on all fours with this case and that, as section 6229(c) tracks section 275, it follows that the substantial omission test not met in Colony was also not met in this case. The equation is mistaken. Colony did not involve the failure to include attributed income; rather, all receipts were disclosed and the taxpayer's only fault was an overstatement of basis.

In the present case, by contrast, the huge payment by Trammell Crow discharging Western's indebtedness to banks is properly treated as a gross receipt and gross income

---

6501 to other types of income. See Lawson v. Comm'r, 67 T.C.M. (CCH) 3121 (1994). But we need not resolve this issue.

-10-

attributable to Western. 26 U.S.C. §§ 752(d), 1001(b); 26 C.F.R. §§ 1.752-1(h), 1.1001-2(a) (2001). All or most of this amount, stipulated as $52,928,095, was simply omitted as an income item on Western's return. In Colony there was no such omission and that was decisive; here, there was. So much for any argument that Colony is directly in point and that its outcome compels the same one here.

However, Western has a second argument based not on Colony's main holding (that a gross receipt must be omitted before the extension applies) but rather on Justice Harlan's reference, quoted above, to the lack of any clue alerting the IRS to an omission from the return. Western's position is that, following Colony, the six year statute is triggered only if the return, in addition to omitting over 25 percent of gross income, also gives the IRS no clue that this omission has occurred. And, it says, the aggregate of Western's indebtedness, reflected in the twelve subsidiary partnerships' Schedule K-1s that were attached to Western's own partnership return, provided that clue.

Read literally, Justice Harlan's reference to the lack of a clue was not at all a description of a condition for implementing section 275. The only test adopted in Colony was that there be an omission of gross receipts exceeding 25 percent

-11-

and not just an overstatement of basis that effectively reduced reportable gross income by that amount.  The clue language was used merely to explain why Congress might have been more concerned about an omitted receipt than an overstated basis-- specifically, because the omitted receipt will (ordinarily) provide no clue as to the error; by implicit contrast, an overstated basis provides something the IRS can check.  Colony, 357 U.S. at 36.

Nevertheless, several Tax Court decisions have described the clue reference as if it were an independent test so that there must be both an omission of over 25 percent and also no clue to the existence of the omission.  E.g., Rhone-Poulenc Surfactants & Specialities, L.P. v. Comm'r, 114 T.C. 533, 557-58 (2000), appeal dismissed and remanded, 249 F.3d 175 (3d Cir. 2001); Univ. Country Club, Inc. v. Comm'r, 64 T.C. 460, 469 (1975).  However, these statements generally appear not as a gloss on section 275 or on section 6229; instead, they are addressed to the second "special rule" in section 6501, which contains this added language:

> In determining the amount omitted from gross income, there shall not be taken into account any amount which is omitted from gross income stated in the return if such amount is disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the Secretary of the nature and amount of such item.

26 U.S.C. § 6501(e)(1)(A)(ii).

On its face, the "adequate to apprise the Secretary of the nature and amount" language establishes a much stiffer test than a mere clue, and quite properly the cases tend to interpret it as requiring far more than a mere clue that might intrigue Sherlock Holmes. George Edward Quick Trust v. Comm'r, 54 T.C. 1336, 1347 (1970), aff'd per curiam, 444 F.2d 90 (8th Cir. 1971). And even if Colony were (wrongly) read as establishing a clue test, it would be difficult to read the adequate disclosure language as adopting that test since the language was enacted four years before Colony was even decided and does not appear in the statute there at issue (section 275). The use of the clue language in decisions construing section 6501's adequate disclosure provision likely reflects an impulse to create a sense of continuity (unfortunately false) between Colony and section 6501's adequate disclosure test.

On top of all this, it is debatable whether this adequate disclosure safe harbor should even be read into section 6229, which is applicable here and contains no such language. And it is also debatable whether this provision should be read literally, as the IRS argues, to require disclosure of the exact amount omitted or merely requires that there be a clear indication that a large amount of gross income was omitted, as

some cases have held, see Univ. Country Club, 64 T.C. at 471; Quick Trust, 54 T.C. at 1347. We need not decide these questions because even if both assumptions are indulged in favor of Western, we think that it still loses in the present case.

Western's argument as to adequate disclosure is that the Schedule K-1s of the twelve partnerships specified figures representing Western's indebtedness immediately before the sale in amounts that, if aggregated, approached $70 million. This, says Western, should have alerted the IRS to a large amount of missing gross income because Western had reported only $27 million as the "gross sales price" on its own return. If the $70 million were treated as attributed income, the reported figure should have been much higher.

But even if the IRS knew that this large amount of pre-sale debt existed, Western does not explain why the IRS should have assumed that the debt was paid off by Trammel Crow incident to its purchase. Nothing in Western's return indicated the allocation of debt or any other sale terms. Possibly, some inference supporting such an assumption could be based on the low amount of basis reported on Western's return; the theory might be that if Western remained liable, it would be part of that basis. But that is not crystal clear to us and Western

offers no argument to show the IRS should have made that assumption.

Further, even if the IRS had inferred that the buyer had paid off Western's debts, it is unclear why this should have created concern and prompted further inquiry. Formally, a buyer's payment discharging the seller's bank debt should be treated as income to the seller, but the parties indicate that it is apparently fairly common in tax reporting for the seller in these circumstances to omit the imputed income on the return but also to omit the same amount from the basis. See also Manolakas, Partnerships and LLCs: Tax Practice and Analysis ¶ 1103.03, at 334 (2000). Because the liabilities are omitted from both income and basis, the omission is normally a "wash" and has no effect on the tax due. Thus, the failure of the IRS to investigate further based solely on these bare facts is understandable.

In the end, the safe harbor provision of section 6501 has to be read in light of its purpose, namely, to give the taxpayer the shorter limitations period where the taxpayer omitted a particular income item from its calculations but disclosed it in substance. The chain of inferences relied upon by Western is simply too thin and doubtful to meet this requirement even on the debatable assumption that the safe

harbor test should be read into section 6229 despite the absence of any language to this effect.  That is enough to resolve this case.

Affirmed.

**APPENDIX**

|  | Western Operations (Reported) | Western Operations (Adjusted) |
|---|---|---|
| Gross Sales Price | <u>$27,965,551</u> | $74,122,212 |
| Proceeds to Third-Party Debt |  | $52,928,095 |
| Proceeds to Employee |  | $   289,245 |
| Partnerships |  |  |
| <u>GROSS SALE PROCEEDS TO WESTERN</u> |  | <u>$20,904,872</u> |
| Tax Basis |  | $ 9,276,412 |
| Selling Expenses |  | $ 1,791,016 |
| Closing Costs |  | $   380,733 |
| Other Costs |  | $   274,495 |
| <u>AGGREGATE COST & OTHER BASIS</u> | <u>$31,161,890</u> | <u>$11,722,656</u> |
| **NET GAIN (LOSS)** | **<u>($3,196,339)</u>** | **<u>$ 9,182,216</u>** |