146 T.C. No. 7

UNITED STATES TAX COURT

JAMES E. THIESSEN AND JUDITH T. THIESSEN, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 11965-10.                          March 29, 2016.

In June 2003 Ps rolled over their tax-deferred retirement funds into newly formed individual retirement accounts (IRAs), caused the IRAs to acquire the initial stock of a newly formed C corporation (E), and caused E to acquire the assets of an existing business. Ps guaranteed the repayment of a loan that E received from the seller of the assets as part of the acquisition price. Ps' 2003 joint Federal income tax return reported that the rollover of the retirement funds into the IRAs was nontaxable. The return did not reveal that Ps had guaranteed the loan. R determined that Ps failed to report for 2003 a taxable distribution from their IRAs. R asserts in support of the determination that Ps' guaranties were prohibited transactions under I.R.C. sec. 4975(c)(1)(B), resulting under I.R.C. sec. 408(e)(2) in deemed distributions of the IRAs' assets to Ps on Jan. 1, 2003. R did not determine that Ps' rollover of the retirement funds into the IRAs was either invalid or taxable.

Held: Ps' guaranties of the loan were prohibited transactions under I.R.C. sec. 4975(c)(1)(B), and the IRAs' assets were deemed

distributed to Ps on Jan. 1, 2003.  Peek v. Commissioner, 140 T.C. 216 (2013), followed.

Held, further, assuming without deciding that I.R.C. sec. 4975(d)(23) is effective for this case, it is inapplicable because Ps' guaranties were not in connection with the acquisition, holding, or disposition of a security or commodity.

Held, further, I.R.C. sec. 6501(e) applies to extend the limitations period for assessment to six years.  Ps' reporting that the rollover was nontaxable was insufficient to advise R of the nature and the amount of the unreported income flowing from the deemed distributions from the IRAs on account of the loan guaranties.

James E. Thiessen and Judith T. Thiessen, pro sese.

E. Abigail Carlson, David A. Conrad, and Matthew A. Houtsma, for respondent.

MARVEL, Judge:  Respondent determined a $180,129 deficiency in petitioners' Federal income tax for 2003.  The deficiency stems from respondent's determination that petitioners received taxable distributions from their individual retirement accounts (petitioners' IRAs) during 2003.  Respondent asserts that the distributions resulted from prohibited transactions under section 4975[1] that

_____

[1]Unless otherwise indicated, section references are to the Internal Revenue Code (Code) as amended and in effect for the year at issue.  Rule references are to
(continued...)

petitioners engaged in with respect to petitioners' IRAs, thus causing the assets in petitioners' IRAs to be deemed distributed to petitioners on January 1, 2003.

We decide first whether petitioners participated in prohibited transactions as respondent asserts. We hold they did. We next examine whether petitioners may benefit from the right to cure set forth in section 4975(d)(23), assuming it is effective for this case. We hold they may not. We decide last whether the six-year limitations period under section 6501(e) allows respondent to assess tax as to 2003. We hold it does.

## FINDINGS OF FACT

### I.     Background

Some facts were stipulated. The stipulations of fact and the facts drawn from stipulated exhibits are incorporated herein, and we find those facts accordingly. Petitioners are married individuals who resided in Colorado when the petition was filed. They were each under 59 years of age at the end of 2003.

### II.     Mr. Thiessen and His Employment at Kroger

James E. Thiessen studied metal fabrication in high school, and he worked at a steel fabricating plant upon graduation. He later worked for a grocery chain

---

[1](...continued)
the Tax Court Rules of Practice and Procedure.

that eventually became a division of Kroger Co. (Kroger). He worked for Kroger and its subsidiary, Dillon Cos., Inc. (collectively, Kroger), for 30 years and participated in Kroger's retirement plans.[2]

During 2002 Kroger informed Mr. Thiessen that it was moving his job to Ohio. Petitioners did not want to move to Ohio. Mr. Thiessen decided to leave Kroger, and he began searching for a new job in metal fabrication. His search included looking for a metal fabrication business that petitioners could acquire.

III.    Ancona

In 2002 Ancona Job Shop (Ancona) was an unincorporated business that specialized in the design, fabrication, and installation of metal products. In early 2003 (or possibly in late 2002) Mr. Thiessen learned that Ancona's owner, Polk Investments, Inc. (Polk), was selling Ancona and that petitioners could acquire Ancona through the brokerage firm A.J. Hoyal & Co., Inc. (AJH).

IV.    Acquisition of Ancona

Petitioners decided to acquire Ancona, and they and AJH began discussing the terms of the acquisition. Jay Hoyal, a broker at AJH, informed petitioners that they could use the funds in their Kroger retirement accounts to acquire Ancona.

---

[2]Kroger established its retirement plans pursuant to sec. 401(a). Those plans were (1) a savings plan and (2) a profit-sharing and savings plan. Judith T. Thiessen also participated in Kroger's retirement plans.

Specifically, he stated, petitioners could roll over their retirement funds into IRAs, cause the IRAs to acquire the initial stock of a newly formed C corporation, and cause the C corporation to acquire Ancona (IRA funding structure). Mr. Hoyal (or possibly someone else at AJH) also explained to petitioners (or possibly to Mr. Thiessen alone) that AJH typically recommended that an acquisition of an existing business be structured to include a loan from the seller so that the seller would have an interest in helping the buyer in the future.

Mr. Thiessen discussed the IRA funding structure with a friend (a former colleague at Kroger) who had recently used that structure to acquire a business. The friend referred Mr. Thiessen to Christian Blees, a certified public accountant. Petitioners discussed the IRA funding structure with Mr. Blees and later asked him to help them implement the IRA funding structure to acquire Ancona. Petitioners also retained Thomas James, an attorney with no prior ties to Mr. Blees or AJH, to help them with the terms of the sale contract and with the terms of a financing arrangement that they would implement to effect the purchase of Ancona. Mr. Blees was not involved in drafting the sale contract or in structuring the financing arrangement.

Mr. Blees and his firm (collectively, Mr. Blees) helped petitioners establish the C corporation, Elsara Enterprises, Inc. (Elsara), that petitioners eventually used

to effect the IRA funding structure. On May 29, 2003, Mr. Blees filed articles of incorporation for Elsara with the Colorado secretary of state. Petitioners were named as Elsara's officers and directors, and they (and no one else) have served in those positions ever since. Elsara has never been characterized as a company with publicly offered securities or with securities issued by an investment company registered under the Investment Company Act of 1940.

On or about June 2, 2003, Mr. Thiessen and Mrs. Thiessen each established an IRA in his and her name (HIRA and WIRA, respectively) at First Trust Co. of Onaga (FTC), with each petitioner retaining all discretionary authority and control concerning investments by his or her IRA (an arrangement referred to as a self-directed IRA).[3] Mr. Thiessen transferred $384,855.80 to the HIRA from his Kroger retirement account, and Mrs. Thiessen transferred $47,220.61 to the WIRA from her Kroger retirement account. Petitioners formally transferred these funds (a total of $432,076.41) as tax-free rollovers, and FTC (after the end of 2003) reported to the Internal Revenue Service (IRS) on 2003 Forms 5498, IRA Contribution Information, that the funds deposited into the IRAs were "Rollover contributions".

---

[3]Petitioners' IRAs are of the type described in sec. 408(a).

On June 9, 2003, Mr. Thiessen directed the HIRA to purchase 8,911 shares of Elsara stock, and Mrs. Thiessen directed the WIRA to purchase 1,089 shares of Elsara stock. Each share was purchased from Elsara at $43.15, for a total purchase price of $431,500 ((8,911 × $43.15) + (1,089 × $43.15)). These shares of stock were the only ones that Elsara issued during the relevant years.

On or about June 18, 2003, Elsara purchased the assets of Ancona from Polk for $601,977.50. The purchase was structured as follows:

| Item | Amount |
|---|---|
| Prorated 2003 property taxes | $212.94 |
| Earnest money deposit (cash) | 60,000.00 |
| Other cash payment | 341,764.56 |
| Promissory note to seller | 200,000.00 |
| Purchase price | 601,977.50 |

The "Earnest money deposit" came from petitioners' personal bank account.[4] The "Other cash payment" came from petitioners' IRAs. The "Promissory note" stated that Elsara would pay $200,000 (plus interest accruing at 7% per annum) to Polk through 60 monthly payments, the first of which was due on September 18, 2003. The note also stated that repayment was secured by "[a]ll items of value used in

---

[4]The record does not establish how Elsara characterized the $60,000 "Ernest money deposit". Respondent makes no argument that this payment from petitioners' bank account had any negative consequence for Federal income tax purposes, and we consider any such argument waived as discussed infra.

the operation of the business known as Ancona Job Shop". The note further stated that petitioners personally guaranteed repayment, and it included petitioners' signed statement to that effect. Mr. James worked out the terms of the financing.

## V. Tax Returns

Elsara has operated Ancona ever since purchasing it. Elsara (doing business as Ancona) filed a Form 1120, U.S. Corporation Income Tax Return (2003 corporate return), for 2003.

Petitioners filed a joint Form 1040, U.S. Individual Income Tax Return, for 2003 (2003 joint return) before April 15, 2004. They reported that they had received IRA distributions totaling $432,076.41,[5] that these distributions were the subject of a "ROLLOVER", and that they had no taxable IRA distributions or tax specifically related to an IRA. They also reported on the 2003 joint return that their gross income was $46,961.60. The 2003 joint return did not disclose petitioners' guaranties of the loan or any other fact that would have put respondent on notice of the nature and the amount of any deemed distribution resulting from the guaranties. The 2003 joint return also did not disclose or even mention Elsara or its 2003 corporate return.

---

[5]Petitioners should have reported that these distributions were from their pension plans (rather than from their IRAs).

## VI.     Deficiency Notice

Respondent mailed petitioners a deficiency notice dated February 18, 2010. Respondent determined that petitioners were liable for a $180,129 income tax deficiency that was attributable primarily to unreported IRA distributions totaling $431,500,[6] that the primary adjustment required computational adjustments to petitioners' itemized deductions, standard deduction, and exemptions, and that petitioners were liable for the 10% additional tax imposed by section 72(t) on IRA distributions because the distributions were premature in that neither petitioner had reached the requisite age of 59-1/2.

## OPINION

## I.     Overview

Respondent determined that petitioners had received taxable distributions from petitioners' IRAs during 2003 and asserts that these distributions are attributable to prohibited transactions under section 4975. Respondent's primary position is that the prohibited transactions occurred under section 4975(c)(1)(B)

---

[6]The deficiency notice stated in relevant part: "We adjusted your gross income to include the amount [stated to be $431,500] you received as a payment from your Individual Retirement Arrangement". The notice further stated that the $431,500 was received from "IRA Distributions". The notice did not state that petitioners' rollover of their retirement funds into the IRAs was either invalid or taxable.

when petitioners guaranteed the loan and that, as of January 1, 2003, the prohibited transactions caused a deemed distribution of all of petitioners' IRAs' assets to petitioners in a taxable transaction. Respondent relies upon Peek v. Commissioner, 140 T.C. 216 (2013), and Ellis v. Commissioner, T.C. Memo. 2013-245, aff'd, 787 F.3d 1213 (8th Cir. 2015), to support his primary position.

We agree with respondent's primary argument that prohibited transactions occurred when petitioners guaranteed the loan. We reach our holdings on the basis of the arguments that the parties made, bearing in mind that issues and arguments not advanced on brief are considered to be abandoned. See Mendes v. Commissioner, 121 T.C. 308, 312-313 (2003); Nicklaus v. Commissioner, 117 T.C. 117, 120 n.4 (2001). Given our agreement with respondent's primary argument, we do not discuss respondent's alternative arguments in support of the determination.

II.    Prohibited Transactions

An IRA ceases to be an IRA if the person for whose benefit the IRA is established (IRA owner) or his or her beneficiary engages in a prohibited

transaction with respect to the IRA. See sec. 408(e)(2)(A).[7] A "prohibited transaction" generally includes "any direct or indirect * * * lending of money or other extension of credit between a plan and a disqualified person". Sec. 4975(c)(1)(B). A "plan" includes an IRA described in section 408(a). See sec. 4975(e)(1)(B). A "disqualified person" includes a "fiduciary". Sec. 4975(e)(2)(A); see also sec. 4975(e)(2)(F), (6) (providing that a spouse of a disqualified person also is a "disqualified person"). A "fiduciary" includes any person who "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets". Sec. 4975(e)(3)(A).

Where the disqualified person is also the IRA owner or his or her beneficiary, the IRA ceases to be an IRA as of the first day of the IRA owner's taxable year in which the prohibited transaction occurs. See sec. 408(e)(2)(A). In addition, the IRA owner is deemed to have received a distribution on that first day

---

[7]Sec. 408(e)(2)(A) provides:

> (A) In general.--If, during any taxable year of the individual for whose benefit any individual retirement account is established, that individual or his beneficiary engages in any transaction prohibited by section 4975 with respect to such account, such account ceases to be an individual retirement account as of the first day of such taxable year. * * *

of an amount equal to the fair market value (on the first day) of the assets in the IRA as of that first day. See sec. 408(e)(2)(B);[8] Bunney v. Commissioner, 114 T.C. 259, 262 (2000). The deemed distribution is generally included in the IRA owner's gross income in accordance with the principles of section 72, see sec. 408(d)(1); see also sec. 408(d)(3) (providing that a rollover contribution is excepted from the general rule of section 408(d)(1)), and the IRA owner also is subject to an additional 10% tax if the IRA owner was not yet 59-1/2 years of age on the date of the distribution and no other exception to the additional tax applies, see sec. 72(t).

Respondent determined that petitioners received taxable distributions from petitioners' IRAs during 2003. Respondent's primary argument in support of this determination is that petitioners' guaranties of the loan were prohibited transactions under section 4975(c)(1)(B) because the guaranties were petitioners' indirect extensions of credit to petitioners' IRAs and that petitioners' participation

---

[8]Sec. 408(e)(2)(B) provides:

     (B) Account treated as distributing all its assets.--In any case in which any account ceases to be an individual retirement account by reason of subparagraph (A) as of the first day of any taxable year, paragraph (1) of subsection (d) applies as if there were a distribution on such first day in an amount equal to the fair market value (on such first day) of all assets in the account (on such first day).

in the prohibited transactions caused the IRAs to lose their status as IRAs and be deemed to have distributed their assets to petitioners in a taxable transaction. We agree with this primary argument.

Our agreement with respondent's primary argument is compelled by the Court's Opinion in Peek v. Commissioner, 140 T.C. 216. There, Mr. Blees promoted the IRA funding structure to two unrelated taxpayers who, pursuant to that promotion, rolled over funds in their retirement plans to self-directed IRAs and caused the IRAs to establish and to wholly own a newly formed corporation. See id. at 218-220. The taxpayers then caused the corporation to purchase (through AJH) the assets of a business by, among other things, receiving from the seller a loan that the taxpayers personally guaranteed. See id. at 217, 220-221. The Court held that the taxpayers were "disqualified persons" within the meaning of section 4975(e)(3) and held that the taxpayers' guaranties of the loan were prohibited transactions in that the guaranties constituted indirect extensions of credit between the taxpayers and the IRAs. See id. at 224-225; see also Janpol v. Commissioner, 101 T.C. 518, 527 (1993) ("An individual who guarantees repayment of a loan extended by a third party to a debtor is, although indirectly, extending credit to the debtor."). The Court held that the taxpayers' participation in the prohibited transactions caused the IRAs to cease qualifying as IRAs within

the meaning of section 408(a) in the year in which the guaranties were made. Peek v. Commissioner, 140 T.C. at 227. Likewise, petitioners' IRAs are "plans" within the meaning of section 4975(e)(1)(B) (petitioners' IRAs are described in section 408(a)), and petitioners are "disqualified persons" within the meaning of section 4975(e)(2)(A) and (3)(A) (petitioners exercised discretionary authority or discretionary control over the management of petitioners' IRAs, as well as over the management and disposition of the assets of petitioners' IRAs). Accord Ellis v. Commissioner, at *16. Therefore, as was true for the taxpayers in Peek, petitioners' guaranties of the loan were prohibited transactions and petitioners' IRAs ceased to qualify as IRAs on account of the guaranties.

Petitioners ask the Court to disregard or to distinguish our Opinion in Peek. Petitioners assert as to the former that the Department of Labor has the primary authority to interpret the prohibited transaction rules and that the Court in Peek interpreted those rules inconsistently with the interpretation of the Department of Labor. Petitioners assert as to the latter that the Court's decision in Peek was driven by findings that the corporation and the IRA were inseparable and that the corporation's assets were deemed to be owned by the IRA. Petitioners also assert that the cases are distinguishable because Elsara is, but the corporation in Peek was not, an "operating company" within the meaning of 29 C.F.R. sec. 2510.3-

101(c)(1) (2003). Petitioners draw from 29 C.F.R. sec. 2510.3-101(a)(2) that petitioners' IRAs cannot be considered to own any of Elsara's assets given Elsara's status as an "operating company".[9]

We decline petitioners' invitation to disregard or distinguish Peek. Congress included provisions on prohibited transactions in both title 26 and title 29, and President Carter gave the Department of Labor primary authority to interpret both sets of those provisions. See Reorganization Plan No. 4 of 1978, sec. 102, 3 C.F.R. 332 (1979), reprinted in 5 U.S.C. app. at 728 (2012) and in 92 Stat. 3790 (1978); see also Flahertys Arden Bowl, Inc. v. Commissioner, 115 T.C. 269, 272-277 (2000), aff'd, 271 F.3d 763 (8th Cir. 2001). That does not mean, however, that the Department of Labor has the final word as to the interpretation of those provisions. "It is emphatically the province and duty of the judicial department to say what the law is." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803); see also United States v. Am. Trucking Ass'ns, Inc., 310 U.S. 534, 544 (1940). We read our Opinion in Peek to be consistent with the statute (and, as a secondary matter, not to be inconsistent with the interpretation of the

---

[9]Pursuant to 29 C.F.R. sec. 2510.3-101(a)(2) (2003), a plan's assets generally include its investment in an entity that is neither a publicly offered security nor a security issued by an investment company registered under the Investment Company Act of 1940 as well as an undivided interest in the entity's underlying assets unless the entity is an "operating company".

Department of Labor, see, e.g., DOL Advisory Op. 90-23A, 1990 WL 263443 (July 3, 1990) (concluding in a setting similar to that in Peek (and here) that a personal guaranty would be a prohibited transaction under section 4975(c)(1)(B)).

We also disagree with petitioners' assertion that the Court rested its holding in Peek on its finding that the corporation and the IRA were inseparable or that the IRA owned the corporation's assets.[10]  In fact, the Court in Peek never mentioned the term "operating company", let alone found or decided that the corporation was or was not an "operating company".  We also are mindful that petitioners in relying upon 29 C.F.R. sec. 2510.3-101(a)(2) make no mention of 29 C.F.R. sec. 2510.3-101(h)(3) or of the preamble to those regulations.  Title 29 C.F.R. sec. 2510.3-101(h)(3) provides:  "When a plan or a related group of plans owns all of the outstanding equity interests * * * in an entity, its assets include those equity interests and all of the underlying assets of the entity".  The preamble to the regulations states:  "[A]s a general matter, where all of the outstanding equity interests in an entity are owned by a plan, there is no practical difference between the assets of the plan and the assets of the entity which is owned by the plan."  51 Fed. Reg. 41276 (Nov. 13, 1986).

---

[10]Our decision here that petitioners' guaranties of the loan were indirect extensions of credit to petitioners' IRAs also does not rest on whether petitioners' IRAs are considered to own any or all of Elsara's assets.

Petitioners argue further that their personal guaranties cannot be prohibited transactions because, when they gave the guaranties, the judiciary had never decided that such guaranties were prohibited transactions. We disagree with this argument as well. Statutory provisions such as section 4975(c)(1)(B) are effective when Congress says they are and, absent a legislative mandate to the contrary (which we do not have here), not when the judiciary first interprets them.

We have also considered the applicability of section 4975(d)(23) and, more specifically, the issue of whether that section excepts petitioners' guaranties from the definition of "prohibited transaction" set forth in section 4975(c)(1)(B).[11] Section 4975(d)(23) was added to the Code as part of the Pension Protection Act of 2006, Pub. L. No. 109-280, sec. 612(b)(1), (c), 120 Stat. at 976, 977, effective with "any transaction which the fiduciary or disqualified person discovers, or reasonably should have discovered, after the date of the enactment of this Act [August 17, 2006] constitutes a prohibited transaction." Section 4975(d)(23) generally provides that the prohibitions set forth in section 4975(c)(1)(B) do not apply to the lending of money or other extension of credit between a plan and a disqualified person "in connection with the acquisition, holding, or disposition of

---

[11]Neither party initially addressed this issue. Each party filed a supplemental brief on the issue pursuant to an order of this Court.

any security or commodity, if the transaction is corrected before the end of the correction period." The legislative history underlying section 4975(d)(23) is thin but indicates that Congress intended for section 4975(d)(23) "to facilitate easier, faster, and less expensive transactions between private pension plans and service providers * * * to ensure that pension plans are not denied certain investment opportunities or overburdened by unnecessary or duplicative regulatory structures that result in higher administrative costs." H.R. Rept. No. 109-232 (Part 1), at 68 (2005).[12]

Respondent acknowledges that section 4975(d)(23) can apply to a prohibited transaction between an IRA and its owner (or beneficiary). Respondent argues, however, that the effective date of the section makes it inapplicable here in that, respondent asserts, petitioners discovered or reasonably should have discovered before August 17, 2006, that their personal guaranties were prohibited transactions. We need not and do not decide respondent's argument as to the

---

[12]The parties do not cite any other contemporaneous legislative history, and we have not found any. We note that the Staff of the Joint Committee on Taxation has discussed the enactment of sec. 4975(d)(23) in Staff of J. Comm. on Taxation, General Explanation of Tax Legislation Enacted in the 109th Congress, at 452-453 (J. Comm. Print 2007), and in Staff of J. Comm. on Taxation, Technical Explanation of H.R. 4, The "Pension Protection Act of 2006", as Passed by the House on July 28, 2006, and as Considered by the Senate on August 3, 2006, at 140-141 (J. Comm. Print 2006).

effective date of section 4975(d)(23). This is because section 4975(d)(23) would not otherwise apply here even if it were effective.

Section 4975(d)(23) requires that petitioners' guaranties be "in connection with the acquisition, holding, or disposition of any security or commodity" and that the guaranties be "corrected before the end of the correction period." In this context, Congress has defined the terms "security" and "commodity" by incorporating (with slight modifications) the definitions of those terms found in section 475(c)(2) and (e)(2), respectively. See sec. 4975(f)(11)(D)(i) and (ii). A "security" for purposes of section 4975(d)(23) includes: (1) a share of stock in a corporation; (2) a partnership or beneficial ownership interest in a widely held or publicly traded partnership or trust; (3) a note, bond, debenture, or other evidence of indebtedness; (4) an interest rate, currency, or equity notional principal contract; (5) an evidence of an interest in, or a derivative financial instrument in, any security described in (1) through (4), or any currency, including any option, forward contract, short position, and any similar financial instrument in such a security or currency; and (6) a position that is not a security described in (1) through (5) and is a hedge with respect to such a security. See secs. 475(c)(2), 4975(f)(11)(D)(i). A "commodity" for purposes of section 4975(d)(23) includes: (1) a commodity that is actively traded; (2) a notional principal contract with

respect to an actively traded commodity; (3) an evidence of an interest in, or a derivative instrument in, any commodity described in (1) or (2), including an option, forward contract, futures contract, short position, and similar instrument in such a commodity; and (4) a position that is not a commodity described in (1) through (3) and is a hedge with respect to such a commodity. Sec. 475(e)(2).

Petitioners' guaranties were not given in connection with the acquisition, holding, or disposition of a security or commodity within the meaning of section 4975(d)(23). Instead, they were given in connection with Elsara's acquisition of assets. Those assets fail to meet the relevant definition of "security" or "commodity". While petitioners gave the guaranties incident to an overall plan that included petitioners' IRAs' acquisition or holding of Elsara stock, the aim of the transaction, to be sure, was to acquire Ancona's assets rather than to acquire Elsara's stock. The more appropriate characterization of the guaranties, therefore, is, as we find, that they were given in connection with the asset acquisition rather than in connection with petitioners' IRAs' acquisition or holding of the Elsara stock.[13]

---

[13]Petitioners also argue that their guaranties of Elsara's debt were in connection with the acquisition, holding, or disposition of a security in the form of the debt. We reject this argument. The debt was issued as part of the transaction and was not acquired, held, or disposed of.

In closing, petitioners' participation in the prohibited transactions on or about June 18, 2003, caused petitioners' IRAs to cease to be IRAs as of the first day of petitioners' taxable year in which the prohibited transactions occurred. See sec. 408(e)(2)(A). Furthermore, petitioners are deemed to have received distributions on that first day of amounts equaling the fair market values (on the first day) of the assets in petitioners' IRAs as of that first day. See sec. 408(e)(2)(B). The first day of petitioners' taxable year in which the prohibited transactions occurred was January 1, 2003. Although petitioners' IRAs were not actually in existence on that date, as they were established approximately five months later, section 408(e)(2) deems them to have been established and funded with the $432,076.41 converted from the Kroger retirement accounts on January 1, 2003, for purposes of determining the amounts of the deemed distributions. Accord Ellis v. Commissioner, at *23-*24.[14] We hold in accordance with this

_____

[14]In Ellis v. Commissioner, T.C. Memo. 2013-245, at *5-*6, *22-*23, aff'd, 787 F.3d 1213 (8th Cir. 2015), the taxpayers, in mid-2005, rolled over their retirement funds into their newly opened IRAs and later in 2005 participated in prohibited transactions connected to the IRAs. The Court held that the prohibited transactions caused the rolled-over funds to be deemed distributed from the IRAs as of January 1, 2005, under sec. 408(e)(2)(A). See id. at *24. The Court reasoned that under sec. 408(e)(2)(A) the IRA accounts ceased being IRAs as of January 1, 2005, on account of the prohibited transactions and that under sec. 408(e)(2)(B) the accounts were deemed to have distributed their assets to the taxpayers also as of that date. See id. at *23. The Court did not hold that the

(continued...)

deemed treatment that petitioners' gross income for 2003 includes the fair market

values of the assets that were initially transferred to petitioners' IRAs or, in other

words, the $432,076.41 converted from the Kroger retirement accounts.[15] Accord

id. We also hold that petitioners are liable for the 10% additional tax set forth in

section 72(t)(1) with respect to the $432,076.41, because neither petitioner was

59-1/2 years of age or older during 2003.[16]

III.    Limitations Period

The Commissioner generally must assess tax as to a Federal income tax

return within three years after the return is filed. See sec. 6501(a); see also sec.

6501(b)(1) (stating that a return filed before its due date is considered filed on its

---

[14](...continued)
rollovers failed ab initio or that the rolled-over funds were taxable as an
unsuccessful rollover distribution from the retirement plans.

[15]Respondent determined that the unreported distributions totaled $431,500
(not $432,076.41 as we have found) and that this number corresponds to the total
amount that petitioners' IRAs paid for the Elsara stock.  Respondent does not
explain how he determined the unreported distribution amount.  Respondent also
has not moved for an increased deficiency, which means that we will not enter in
our decision a deficiency greater than that shown in the deficiency notice.  See sec.
6214(a); Estate of Petschek v. Commissioner, 81 T.C. 260, 271-272 (1983), aff'd,
738 F.2d 67 (2d Cir. 1984); see also Koufman v. Commissioner, 69 T.C. 473, 475-
476 (1977).

[16]Petitioners do not assert that they meet an exception to the sec. 72(t)
additional tax, and we do not find that any such exception applies.

due date for purposes of section 6501(a)).  Section 6501(e)(1) may extend the three-year period to a six-year period, however, where the taxpayer fails to report gross income in excess of 25% of the amount of gross income reported on the return.  See also United States v. Home Concrete & Supply, LLC, 566 U.S. __, __, 132 S. Ct. 1836, 1839 (2012); Burbage v. Commissioner, 82 T.C. 546, 553 (1984), aff'd, 774 F.2d 644 (4th Cir. 1985); Bardwell v. Commissioner, 38 T.C. 84, 92-93 (1962), aff'd, 318 F.2d 786 (10th Cir. 1963).

In computing the amount of gross income omitted for this purpose, any amount "disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the Secretary of the nature and amount of such item" is not taken into account.  See sec. 6501(e)(1)(A)(ii).[17]  A disclosure is "adequate" if it is "sufficiently detailed to alert the Commissioner and his agents as to the nature of the transaction so that the decision as to whether to select the return for audit may be a reasonably informed one." Estate of Fry v. Commissioner, 88 T.C. 1020, 1023 (1987); see also Colony, Inc. v. Commissioner, 357 U.S. 28, 36 (1958).  The disclosure need not detail every underlying fact but must be more substantial than simply providing a clue that would intrigue the likes of Sherlock Holmes.  See

[17]The Hiring Incentives to Restore Employment Act, Pub. L. No. 111-147, sec. 513(a)(1), 124 Stat. at 111 (2010), redesignated this provision as sec. 6501(e)(1)(B)(ii).

Quick's Tr. v. Commissioner, 54 T.C. 1336, 1347 (1970), aff'd, 444 F.2d 90 (8th Cir. 1971); see also White v. Commissioner, 991 F.2d 657, 661-662 (10th Cir. 1993), aff'g T.C. Memo. 1991-552. The test is whether a reasonable person would discern from the return that the disputed gross income is omitted. See Univ. Country Club, Inc. v. Commissioner, 64 T.C. 460, 471 (1975).

The parties agree that the three-year limitations period has expired. Respondent's reliance on the six-year period, therefore, requires that he show that petitioners failed to report an amount of gross income in excess of 25% of the amount of gross income reported on the 2003 joint return. See Hoffman v. Commissioner, 119 T.C. 140, 147 (2002). Respondent has made this showing in that, as we have held, petitioners omitted gross income for purposes of section 6501(e) when they failed to report the amounts of the deemed distributions as gross income for 2003.[18] See id. (noting that although section 6501 does not define the term "gross income" for purposes of section 6501(e), the term is generally understood to refer to the definition of gross income found in section 61); cf. Benson v. Commissioner, 560 F.3d 1133, 1136-1137 (9th Cir. 2009)

_____

[18]We note for completeness that the deemed distributions exceed 25% of the amount of gross income reported on the 2003 joint return.

(holding that the failure to report constructive dividends was an omission of gross income under section 6501(e)(1)), aff'g T.C. Memo. 2006-55.

The six-year limitations period therefore applies unless petitioners prove that the amounts of the deemed distributions were "disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the Secretary of the nature and amount of such item."[19] See sec. 6501(e)(1)(A)(ii); see also Hoffman v. Commissioner, 119 T.C. at 147; Univ. Country Club, Inc. v. Commissioner, 64 T.C. at 468. Petitioners have not met this burden.

Petitioners argue that the three-year limitations period applies because they disclosed on the face of their 2003 joint return that they rolled over their Kroger retirement fund distributions into the IRAs. Petitioners also argue that they were not required to make any further disclosure as to the rolled-over funds because caselaw as of the time they filed the 2003 joint return did not put them on notice that anything they did during 2003 was a prohibited transaction.

Petitioners' primary argument is flawed in that it rests on the proposition that petitioners' disclosure of the rollovers as tax-free is sufficient to put

---

[19]Under sec. 7491(a), the burden of proof as to factual matters may shift to the Commissioner in certain circumstances. Neither at trial nor in their opening brief did petitioners mention sec. 7491(a), and we understand petitioners to have agreed at trial that they bear the burden of proof. See also Rule 142(a)(1).

respondent on notice that petitioners had engaged in the prohibited transactions.
As discussed above, the prohibited transactions are petitioners' guaranteeing of
the loan, and the unreported income arises from the resulting taxable deemed
distribution to petitioners of the assets in petitioners' IRAs (and not from
petitioners' rollover of the retirement funds into petitioners' IRAs). Indeed, the
deficiency notice states specifically that the unreported income stems from IRA
distributions and makes no mention of the rollovers or the taxability thereof.[20]

[20]We can understand petitioners' confusion on the facts and law surrounding the prohibited transactions. Respondent in brief also was sometimes confused. Respondent argued first (consistent with our opinion in Ellis v. Commissioner, T.C. Memo. 2013-245, and with our Opinion here) that petitioners' participation in the prohibited transactions caused the assets in the IRAs to be deemed distributed to petitioners as of January 1, 2003. Respondent later asserted, with a citation of Ellis, that the transfers of the retirement funds to the IRAs were invalid and that the transferred funds were therefore includable in petitioners' income as if no rollover had occurred. The later assertions are not supported by Ellis. We held in Ellis v. Commissioner, at *24, that the prohibited transactions caused the rolled-over funds to be deemed distributed from the IRAs and expressed no opinion on the validity or the taxability of the rollovers. The deficiency notice here states likewise that the unreported income was from "IRA Distributions" and does not state that the income was from any distribution from petitioners' Kroger retirement plans. We also note that the funds that were transferred from petitioners' Kroger retirement plans to petitioners' IRAs would have been includable in petitioners' gross income as distributions from the retirement plans (rather than from the IRAs) had the rollovers not been valid. See sec. 402(a) (rules applicable to the taxation of distributions); see also sec. 402(c) (rules applicable to rollovers from exempt trusts).

Neither the 2003 joint return nor any attachment to it disclosed that petitioners' guaranties of a loan might be prohibited transactions or that petitioners had unreported income resulting from prohibited transactions. The 2003 joint return therefore offers not even a clue as to the existence, nature, or amount of any omitted income. We conclude that a reasonable person would not discern from the 2003 joint return that petitioners had omitted any gross income for 2003, and we hold that the six-year limitations period under section 6501(e) applies. See Estate of Fry v. Commissioner, 88 T.C. at 1023. As to petitioners' secondary argument, section 6501(e) does not condition an application of the six-year limitations period on petitioners' knowing that the guaranties were prohibited transactions.

Petitioners also argue that the facts underlying the prohibited transactions were adequately disclosed in Elsara's 2003 corporate return. For purposes of this issue, however, the relevant taxpayers are petitioners. Their return (the 2003 joint return) makes no reference to Elsara or its 2003 return or to the fact that petitioners participated in the prohibited transactions.

IV. Conclusion

We hold that petitioners participated in prohibited transactions in 2003 and that respondent properly determined that petitioners had unreported deemed

distributions from petitioners' IRAs.  We also hold that the six-year limitations period allows respondent to assess the income tax deficiency for 2003.

We have considered petitioners' remaining arguments, and to the extent not discussed above, conclude that those arguments are irrelevant, moot, or without merit.  To reflect the foregoing,

<u>Decision will be entered for</u>

<u>respondent</u>.