# United States Tax Court

T.C. Memo. 2026-33

JONATHAN D. SAWYER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

––––––––––

Docket No. 11758-21.                                    Filed April 16, 2026.

––––––––––

*David Klemm* and *James Everett*, for petitioner.

*James H. Wozny*, *Paul Colleran*, and *Michael E. D'Anello*, for respondent.


## MEMORANDUM FINDINGS OF FACT AND OPINION

COPELAND, *Judge*: From 1979 until its liquidation in 2010, Jonathan Sawyer owned and operated Henry N. Sawyer (HNS), a family printing business dating back to 1835. In 1982 he purchased a life insurance policy (Policy) on himself from Northwestern Mutual Life Insurance Co. (Northwestern). Depending on the liquidity of the business, he would either pay the quarterly life insurance premium in cash or allow Northwestern's automatic premium loan provision to cover the quarterly premium. In 2009, near HNS's last chapter, Mr. Sawyer took out an $80,000 loan secured by the value of the Policy in an attempt to keep HNS afloat. In 2015 the policy loan (Policy Loan) and premium loan (Premium Loan) balances eclipsed the Policy's cash surrender value, such that the Policy had a net value of zero and insufficient liquidity to cover future quarterly premiums. Northwestern thereafter automatically terminated the Policy, resulting in Mr. Sawyer's constructive receipt of income with no attendant cash. In a Notice of Deficiency dated April 12, 2021, the Commissioner of Internal Revenue

[*2] (Commissioner) determined for Mr. Sawyer's 2015 tax year a deficiency of $50,150, a section 6651(a)(1)[1] addition to tax of $10,463 for failure to timely file, a section 6651(a)(2) addition to tax of $11,625 for failure to timely pay, and a section 6654 addition to tax of $830 for failure to make sufficient estimated tax payments.

After concessions,[2] the issues remaining for consideration are whether Mr. Sawyer constructively received $160,900[3] from Northwestern in 2015 upon the termination of the Policy and, if so, whether he is entitled to deduct investment interest; as well as whether he is liable for the failure to timely file and pay additions to tax.

## FINDINGS OF FACT

These findings are derived from the parties' pleadings and Motion papers, a Stipulation of Facts with attached Exhibits, and the documents and testimony admitted into evidence at trial. Mr. Sawyer resided in Massachusetts when his Petition was timely filed.

Mr. Sawyer is a fifth-generation printer. He began working at HNS in high school starting in the shipping department (later taking on roles in prepress, press estimation, and then sales) before becoming its chief executive officer (CEO) in 1979 and acquiring 100% of its common stock.

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C.), in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. Some dollar amounts are rounded to the nearest dollar.

[2] For the 2015 tax year, the Commissioner has conceded the section 6654 addition to tax for failure to make sufficient estimated tax payments. Mr. Sawyer has conceded that he received $35,687 in wages from J.S. McCarthy Co., Inc., and $44 in proceeds from National Financial Services, LLC. Furthermore, Mr. Sawyer's Opening Brief requests that he be "allowed itemized deductions for items such as taxes and charitable contributions paid during 2015"; however, the amounts and further details regarding the purported deductions were not delineated, no evidence was introduced at trial in that regard, and no legal arguments were advanced in support of those deductions. Consequently, we consider the request abandoned. *See, e.g.*, *Thiessen v. Commissioner*, 146 T.C. 100, 106 (2016) ("[I]ssues and arguments not advanced on brief are considered to be abandoned."); *Rockafellor v. Commissioner*, T.C. Memo. 2019-160, at *12; *Rose v. Commissioner*, T.C. Memo. 2019-73, at *39; *see also* Rule 151(e)(4) and (5).

[3] The difference between the value of the life insurance policy, $205,433.81, and Mr. Sawyer's investment in the contract, $44,533.42, equals $160,900.39.

**[*3]**    In 1982, a few years after becoming CEO, Mr. Sawyer took out a $200,000 life insurance policy on himself from Northwestern with a quarterly premium of $816 so that his wife would be provided for in the event of his death.[4]  He was designated the initial owner of the Policy. Relevant here, section 2.2 of the Policy states that ownership was transferable but that such a transfer would only be effective upon Northwestern's receipt of satisfactory written proof.

As indicated above, Mr. Sawyer did not always have cash on hand to pay the Policy's quarterly premium.  However, because he had elected an automatic premium loan option, the Policy did not lapse.  Instead, Northwestern secured the premium payments by borrowing against the Policy's cash surrender value such that there was continuous coverage. Like all loans, the Premium Loan accrued interest.  Mr. Sawyer periodically paid down the Premium Loan balance, although not always. Northwestern for its part was contractually protected pursuant to section 6.3 of the Policy, which provided that the Policy would be automatically canceled if the balance of the premium loans and any other loans met or exceeded the Policy's cash surrender value.

Over time the printing business suffered from significant volatility.  To remain competitive, printers needed increasingly sophisticated equipment, lest customers question the quality of the products.  Such equipment came at a commensurate cost.  By way of example, HNS purchased a printing press in 1999 that cost $1.5 million and required Mr. Sawyer's personal guarantee.  At an unspecified date, when the balance of the printing press loan loomed at around $1.2 million, Mr. Sawyer was forced to refinance that loan with another lender, TD Bank, and he was required to pledge his personal residence as collateral.

Exacerbating HNS's financial situation, in or around 2004 it lost one of its largest customer accounts, then worth roughly $1.5 million and representing approximately a third of its total sales.  Mr. Sawyer was often required to intervene to keep the company afloat by injecting cash to pay wages and payroll taxes, and to purchase necessary supplies and printing equipment for the business.  To accomplish this, he liquidated his section 401(k) account (worth approximately $150,000), borrowed on his and his wife's credit cards (incurring approximately $100,000 in debt), and borrowed $750,000 from his uncle.  Likewise, when HNS defaulted on the TD Bank loan, the bank initiated

---

[4] Later, his sister was added to the policy as a contingent beneficiary.

[*4] foreclosure proceedings against Mr. Sawyer's personal residence, and he was forced to sell the home to satisfy that debt. As previously noted, he also borrowed against the value of the Policy. In particular, on May 9, 2009, he borrowed $80,000 from Northwestern, secured by the cash surrender value of the Policy. Northwestern sent that $80,000 check to HNS's business address, and it was deposited into HNS's business bank account. In conjunction with this $80,000 capital infusion into HNS, Mr. Sawyer believed that he directed Paul Leonard, HNS's bookkeeper, to send Northwestern the paperwork to transfer ownership of the Policy to HNS. Mr. Leonard has no recollection of filing that paperwork, and there is no evidence reflecting a change in ownership of the Policy.

Overall, despite Mr. Sawyer's best efforts, HNS could not sustain its business model and was liquidated in 2010. As it was winding down, it sold off much of its equipment at a significant loss. For example, the aforementioned printing press purchased for $1.5 million was sold for $150,000. As HNS vacated its premises, many of its records were lost or inadvertently destroyed. After HNS closed its books in 2010, Mr. Sawyer found employment at J.S. McCarthy Co., Inc., another publisher. However, he remained liable for HNS's payroll tax liabilities, which resulted in a significant portion of his wages' being garnished until that liability was fully satisfied.

Even after HNS's shuttering, Mr. Sawyer continued receiving correspondence from Northwestern regarding the Policy; all of that paperwork was addressed to him and reflected him as the Policy's owner. He believed the paperwork to be in error and, in 2013, made one attempt to contact the agent for his account but was advised by Northwestern that the agent no longer worked there. He took no further action to clarify the Policy's ownership with Northwestern. A notice of cancellation was sent to Mr. Sawyer on July 26, 2015.[5] According to Northwestern, the cash surrender value at that time was $205,433.81 and it was used to satisfy the outstanding indebtedness as follows:

---

[5] Mr. Sawyer argues that Northwestern also sent a notice of cancellation on December 10, 2013; however, the Northwestern Policy Loan History indicates both that there was an "Overloan Surrender" on December 10, 2013, and that the Policy was "Reinstated" on February 5, 2014, with additional interest added to the Policy, as well as other activity through at least July 26, 2015.

| | Type of Loan | Principal | Accrued Interest | Total |
|---|---|---|---|---|
| [*5] | Policy Loan | $80,000.00 | $40,107.22 | $120,107.22 |
| | Premium Loan | 42,750.07 | 42,576.52 | 85,326.59 |
| | Grand Totals | 122,750.07 | 82,683.74 | 205,433.81 |

Mr. Sawyer's investment in the life insurance contract was $44,533.42, making the taxable portion of the distribution $160,900.39.

Mr. Sawyer did not file a tax return for his 2015 tax year. He received Form 1099–R, Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc., from Northwestern reporting that he received a taxable distribution of $160,900. Because he believed the Form 1099–R to be inaccurate, Mr. Sawyer consulted with a number of tax attorneys concerning the proper tax reporting with respect to the constructive distribution. However, he did not receive a clear answer and ultimately did not file a federal income tax return. In its stead, the Commissioner prepared a substitute for return (SFR) pursuant to section 6020(b).[6]

## OPINION

I.    *Burden of Production and Burden of Proof*

The IRS's determinations in a Notice of Deficiency are generally presumed correct, though the taxpayer can rebut this presumption. *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). However, in cases involving unreported income, the Commissioner must first establish an evidentiary foundation connecting the taxpayer with the income-producing activity, *see Portillo v. Commissioner*, 932 F.2d 1128, 1133 (5th Cir. 1991), *aff'g in part, rev'g in part and remanding* T.C. Memo. 1990-68, or demonstrate that the taxpayer actually received income, *Edwards v. Commissioner*, 680 F.2d 1268, 1270–71 (9th Cir. 1982) (per curiam). Information supplied to the IRS by the taxpayer's employer on Form W–2, Wage and Tax Statement, or by other payors on Forms 1099, is sufficient to meet this burden. *See Hardy v. Commissioner*, 181 F.3d 1002, 1004–05 (9th Cir. 1999), *aff'g* T.C. Memo. 1997-97. "Once the Commissioner makes the required threshold showing, the burden shifts to the taxpayer to prove by a preponderance of the evidence that the Commissioner's determinations are arbitrary or

---

[6] Section 6020(b) provides that, if any person fails to make any return required by law, "the Secretary shall make such return from his own knowledge and from such information as he can obtain." *See also Rodriguez v. Commissioner*, T.C. Memo. 2009-22, 97 T.C.M. (CCH) 1090, 1092 ( "[T]he IRS has full authority to prepare an SFR for anyone who fails to file his own return.").

[*6] erroneous." *Walquist v. Commissioner*, 152 T.C. 61, 67–68 (2019) (citing *Helvering v. Taylor*, 293 U.S. 507, 515 (1935)); *see Texasgulf, Inc., & Subs. v. Commissioner*, 172 F.3d 209, 214 (2d Cir. 1999), *aff'g* 107 T.C. 51 (1996). The IRS may not rely solely on a third-party report of income, such as Form 1099, if the taxpayer raises a reasonable dispute concerning the accuracy of the report and has fully cooperated with the Secretary. *See* I.R.C. § 6201(d). Here, the Commissioner has met his burden of production. In addition to the Form 1099–R, which Mr. Sawyer reasonably disputes, the Commissioner has provided a copy of Mr. Sawyer's Northwestern Policy and other correspondence from Northwestern addressed to Mr. Sawyer regarding the Policy and the loan, as well as the loan default. All of this is sufficient, and the Commissioner has met his burden of production such that the burden of proof shifts to Mr. Sawyer.

## II.     *Ownership of the Policy*

Mr. Sawyer contends that, in 2015, the defunct HNS owned the Policy and was therefore entitled to the Policy's cash surrender value and responsible for the Policy's loans. He relies on *Clark v. Commissioner*, T.C. Memo. 1997-209, a case in which our Court held that a third party performing services and ultimately receiving the resultant income was subject to taxation on the same. Conversely, the Commissioner argues that Mr. Sawyer owned the Policy in his personal capacity. What is clear is that Mr. Sawyer originally purchased the Policy in 1982, naming his wife as the beneficiary. Some years later, he added his sister as a supplemental beneficiary. In 2008 or 2009 Mr. Sawyer attempted to assign the Policy to HNS, claiming to have directed Mr. Leonard to send Northwestern the requisite paperwork. However, the record supporting this assertion is sparse save for Mr. Sawyer's testimony, which merely supports his attempt to assign the Policy to HNS rather than its accomplishment.

The remainder of the evidence demonstrates that ownership of the Policy remained with Mr. Sawyer. While the Policy was susceptible to assignment, section 2.2 of the Policy states that such an assignment would become effective only upon Northwestern's receipt of satisfactory written proof of transfer. Although Mr. Sawyer claims to have enlisted Mr. Leonard to mail the notice of assignment, Mr. Leonard did not recall doing so, and Northwestern's records do not reflect any assignment of the Policy. Furthermore, even after Mr. Sawyer's purported assignment, up until Northwestern terminated the Policy, Northwestern addressed all correspondence to him and consistently

**[\*7]** reflected him as the policyholder. Mr. Sawyer made one feeble attempt to contact Northwestern to address this discrepancy but nothing more. While he may have intended to assign the Policy to HNS, his actions do not support an actual transfer. Further, as to the $80,000 Policy Loan ultimately invested in HNS, there was no apparent mechanism for HNS to borrow funds from Northwestern. Mr. Sawyer, as insured and owner of the Policy, had to borrow the funds and invest them in HNS. His reliance on *Clark* is inapposite, as there were no services performed by HNS in exchange for the funds. *See id.* Nor was there any contractual relationship between Northwestern and the purported ultimate recipient of the Policy Loan funds (HNS) that would allow us to recharacterize the $80,000 Policy Loan as made to HNS rather than to Mr. Sawyer. The reality of the transaction was that Mr. Sawyer personally borrowed from Northwestern, then made a corresponding capital contribution to HNS.

In the absence of any concrete countervailing evidence, we find that Mr. Sawyer owned the Policy continuously from its purchase to its cancellation. We likewise note that taxpayers are obligated to keep sufficient records, *see* I.R.C. § 6001, and that the lack thereof weighs heavily against Mr. Sawyer.

Given that Mr. Sawyer retained ownership of the Policy, we next address the taxation of the Policy termination and loan repayment.

III. *Taxation of the Policy Termination and Loan Repayment*

Section 61(a) defines gross income as "all income from whatever source derived." Gross income is construed broadly to include all "accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 431 (1955). Having established that the Policy belongs to Mr. Sawyer, it follows that any gain therefrom should belong to him.

Gross income includes nonannuity amounts received under a life insurance contract in excess of the investment in the contract. I.R.C. § 72(e)(5). Investment in the contract is defined as the amount of premiums paid less amounts received under the contract that were excludable from gross income. I.R.C. § 72(e)(6). Mr. Sawyer questions whether the indirect distribution of the taxable portion of his insurance contract can be nonetheless taxable to him where it was used to extinguish policy debt rather than distributed. He posits that he did not receive anything. However, a taxpayer is required to recognize an

**[\*8]** indirect distribution of an insurance policy's cash surrender value as gross income under section 72. This Court has already addressed this question in *Atwood v. Commissioner*, T.C. Memo. 1999-61, 77 T.C.M. (CCH) 1476. In *Atwood* a husband and wife held life insurance policies, and both borrowed against their respective policies; when the policies terminated, the life insurance company used their respective cash surrender values to satisfy their loans and issued both of them Forms 1099–R reflecting the gain from the surrender of their policies. This Court held that each had received a deemed distribution to the extent of the satisfied loans. *Id.* at 1478 ("[Any other conclusion] would permit policy proceeds, including previously untaxed investment returns, to escape tax altogether and finds no basis in the law."); *see also McGowen v. Commissioner*, T.C. Memo. 2009-285, *aff'd*, 438 F. App'x 686 (10th Cir. 2011).

Northwestern terminated the Policy on July 26, 2015, when the amount of Mr. Sawyer's loans (both the Policy Loan and the Premium Loan) and interest eclipsed the cash surrender value of the policy. Although Mr. Sawyer did not receive any cash, the entirety of the Policy's value having been applied against the outstanding loans, he is nonetheless treated as having received a taxable constructive distribution of $160,900.39, similarly to the taxpayers in *Atwood*. The loan repayment is treated as if the cash value of the Policy was transferred to Mr. Sawyer and he in turn repaid the outstanding loans.

IV. *Interest Deduction*

Deductions are a matter of legislative grace, and taxpayers generally bear the burden of proving their entitlement to the deductions claimed. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992). Thus, a taxpayer claiming a deduction on a federal income tax return must demonstrate that the deduction is provided for by statute and must maintain records sufficient to enable the Commissioner to determine the correct tax liability. *See* I.R.C. § 6001; *Hradesky v. Commissioner*, 65 T.C. 87, 89–90 (1975), *aff'd per curiam*, 540 F.2d 821 (5th Cir. 1976); Treas. Reg. § 1.6001-1(a).

Although we have determined that the Policy belonged to Mr. Sawyer and that the deemed distribution of the cash surrender value is taxable to him, we now address his alternative arguments—that interest paid on the loans is deductible as investment interest to the extent the proceeds (1) from the Policy Loan were invested into HNS

**[\*9]** and/or (2) from the Premium Loan paid for the investment aspect of the life insurance contract.

A.    *Interest on the $80,000 Policy Loan*

Individual taxpayers may deduct interest other than personal interest.  I.R.C. § 163(a), (h)(1).  In relevant part, interest other than personal interest includes, among other things, trade or business interest and investment interest.  I.R.C. § 163(h)(2)(A) and (B); *see also Atwood*, 77 T.C.M. (CCH) at 1478.

Mr. Sawyer focuses only on the exception for investment interest found in section 163(h)(2)(B) and abandoned any argument that it was trade or business interest under section 163(h)(2)(A).  He contends that, by application of the tracing rules in Temporary Treasury Regulation § 1.163-8T, interest related to the $80,000 Policy Loan is deductible investment interest because the proceeds were invested in HNS stock. The Commissioner, on the other hand, contends Mr. Sawyer did not establish that the funds were in fact invested in HNS, such that no deduction should be allowed.

Thus, as a threshold matter, we start by determining whether the $80,000 loan proceeds were used as Mr. Sawyer contends as a further investment in his HNS stock or whether the Commissioner prevails because Mr. Sawyer could not substantiate the disposition of those funds.  On this point Mr. Sawyer was quite a credible witness.  He testified that he invested the Policy Loan in HNS, given its economic headwinds.  It is clear that he withdrew funds from his section 401(k) account, borrowed money from family members, and sold his home in an attempt to keep the business afloat.  Consequently, it follows that the loan from the Policy was likewise invested in HNS.  He credibly testified that the check was sent by Northwestern to HNS's business address and was deposited in HNS's bank account.  The Commissioner makes much of the lack of company records documenting this transaction; however, upon closure of HNS such records were destroyed.  The Commissioner likewise points out that Mr. Leonard did not recall recording an $80,000 cash infusion relating to the Policy Loan in HNS's books.  At trial Mr. Leonard testified that he vaguely recalled the $80,000 transaction but, given the passage of time since the transaction, he was uncertain as to whether he had recorded the transaction on the books of HNS.  On balance, Mr. Sawyer's position on this point had merit, and he established that the $80,000 loan proceeds were in turn invested in HNS.

**[\*10]** We next turn to whether such an investment could create deductible investment interest. For a taxpayer to prevail in deducting investment interest, he must first prove that the borrowing was made with regard to "property held for investment." *See Russon v. Commissioner*, 107 T.C. 263, 270 (1996) (quoting I.R.C. § 163(d)(5)(A)(i)). Property held for investment is further defined in section 163(d)(5) as follows:

> (A) In general.—The term "property held for investment" shall include—
>> (i) any property which produces income of a type described in section 469(e)(1), and
>> (ii) any interest held by a taxpayer in an activity involving the conduct of a trade or business—
>>> (I) which is not a passive activity, and
>>> (II) with respect to which the taxpayer does not materially participate.
>
> . . . .
> (C) Terms.—For purposes of this paragraph, the terms "activity", "passive activity", and "materially participate" have the meanings given such terms by section 469.

Because Mr. Sawyer materially participated in HNS's business, we focus on section 163(d)(5)(A)(i) and whether the stock in HNS produced income of the type described in section 469(e)(1), viz, "interest, dividends, annuities or royalties not derived in the ordinary course of a trade or business." This type of income is often referred to as portfolio income.

As explained in *Russon*, 107 T.C. at 270, stock is generally productive of dividends such that the interest paid to purchase stock would be investment interest. The same is true for HNS. Mr. Sawyer's investment in HNS was to keep the business afloat, ultimately earning income that would lead to dividends. Consequently, the HNS stock was property held for investment, and the underlying interest paid to support that investment was investment interest. As investment interest, it is likewise subject to the limitations of section 163(d)(1), which provides that "[i]n the case of a taxpayer other than a corporation, the amount allowed as a deduction under this chapter for investment interest for any taxable year shall not exceed the net investment income of the taxpayer for the taxable year."

**[\*11]**  Thus, as to the $40,107 interest on the $80,000 Policy Loan that was satisfied in 2015 with an offset to Mr. Sawyer's cash surrender value, it was investment interest subject to the limitations of section 163(d)(1) and will only be deductible to the extent of net investment income for the 2015 tax year.

 B.  *Premium Loan Interest*

 Mr. Sawyer next argues that the interest related to the Premium Loan is likewise deductible on the theory that the life insurance contract has both insurance and investment characteristics.  However, no evidence has been adduced regarding how the interest should be allocated between the contract's insurance aspect and its investment aspect.  Moreover, the legislative history surrounding the enactment of section 163(h), which disallows the deduction of personal interest, provides great insight as to the types of interest that should be considered personal interest.  In particular, the Joint Committee on Taxation explained as follows:

> Under the Act, personal interest is not deductible. Personal interest is any interest, other than interest incurred or continued in connection with the conduct of a trade or business (other than the trade or business of performing services as an employee), investment interest, or interest taken into account in computing the taxpayer's income or loss from passive activities for the year.  Thus, personal interest includes, for example, interest on a loan to purchase an automobile, *interest on a loan to purchase a life insurance policy*, and credit card interest, where such interest is not incurred or continued in connection with the conduct of a trade or business.

Staff of J. Comm. on Tax'n, 100th Cong., General Explanation of the Tax Reform Act of 1986, JCS-10-87, at 266 (J. Comm. Print 1987) (emphasis added) (footnote omitted).  Consistent with this statutory intent, the Premium Loan interest used to finance Mr. Sawyer's life insurance premiums is personal interest and not deductible.[7]

---

 [7] We note that even if this interest were not personal interest, section 264(a)(3) likewise prohibits interest deductions for investments in life insurance products that contemplate direct or indirect borrowing from cash surrender value to finance premiums, as here.  Section 264(a)(3) and (d)(1) contains an exception if no part of the annual premium is paid from cash surrender value in four of the seven initial years of

**[\*12]** V.    *Additions to Tax Under Section 6651(a)(1) and (2)*

The Commissioner determined additions to tax under section 6651(a)(1) and (2), for which he has the burden of production. *See* I.R.C. § 7491(c). The Commissioner satisfied this burden by introducing evidence that Mr. Sawyer did not file a tax return for his 2015 tax year, for which the Commissioner prepared an SFR. *See Frost v. Commissioner*, 154 T.C. 23, 33–34 (2020). Mr. Sawyer does not contest that he did not file a tax return for 2015, nor does he contest that he did not pay the tax due at issue. However, he claims that reasonable cause exists for both the failure to file and the failure to pay. *See* I.R.C. § 6651(a)(1) and (2). The reasonable cause defense is evaluated considering all the facts and circumstances. *Higbee v. Commissioner*, 116 T.C. 438, 448 (2001); Treas. Reg. § 301.6651-1(c)(1).

With respect to the failure-to-file addition to tax, Mr. Sawyer's primary claim for reasonable cause rests on the fact that he attempted to clarify the proper reporting position by conferring with various tax attorneys. After receiving no clear answer, he did not file a tax return for 2015. Regardless, even if the proper reporting position for the insurance proceeds was unclear, Mr. Sawyer had wage and other income that would have required him to file a tax return. Mr. Sawyer did not receive advice telling him not to file a tax return, and he could not rely on such advice if he had received it. Accordingly, reasonable cause does not exist with respect to the failure to file.

With respect to the failure-to-pay addition to tax, Mr. Sawyer's reasonable cause defense is based on an inability to pay or, alternatively, that payment would have caused undue hardship. Reasonable cause for a failure to pay exists if a taxpayer exercised ordinary business care but nevertheless cannot pay the tax. Treas. Reg. § 301.6651-1(c)(1). For instance, a taxpayer is considered to have exercised ordinary business care if he made reasonable efforts to conserve sufficient assets to satisfy his liability but was nevertheless unable to pay all of the tax due. *Id.* In 2015 Mr. Sawyer earned wages of $35,687, $6,379 of which was withheld. The deficiency determined by the Commissioner is $50,150, over 140% of Mr. Sawyer's wages. Moreover, the record shows that in prior years, Mr. Sawyer's wages had already been garnished to pay a trust fund recovery penalty related to HNS. And by 2015 Mr. Sawyer had long since sold his home to avoid foreclosure and exhausted much

---

the policy; however, that exception would not apply here because such borrowing occurred in the first four of seven years of Mr. Sawyer's Policy.

**[\*13]** of his personal assets in an attempt to keep HNS afloat. There is ample evidence that Mr. Sawyer had neither the assets nor the income to pay his 2015 tax. Nor is his inability to pay attributable to a lack of ordinary business care. Mr. Sawyer's wages were foreseeable, and he paid the tax thereupon; conversely, the cancellation of a life insurance policy he had thought transferred and the magnitude of the constructive income therefrom were not reasonably foreseeable. Mr. Sawyer's financial difficulties did not arise because of negligence or lavish spending. Nor could Mr. Sawyer realistically borrow to satisfy the tax liability, given his financial history, default on the loan for which his home was collateral, and the lack of other assets. Accordingly, reasonable cause existed with respect to the failure to pay.

VI.   *Conclusion*

On the basis of the preceding analysis and in addition to the concessions by the parties, we hold that Mr. Sawyer constructively received taxable income of $160,900 from Northwestern upon the termination of the Policy; that he is entitled to a deduction of so much of the $40,107.22 investment interest paid as does not exceed his net investment income; and that he is liable for the section 6651(a)(1) failure-to-file addition to tax but not the section 6651(a)(2) failure-to-pay addition to tax.

To reflect the foregoing,

*Decision will be entered under Rule 155.*